IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JM HOLDINGS 1 LLC AND ) <br> CEDAR HOLDINGS, LLC ) <br> ) <br>      Plaintiffs, ) <br> ) <br>      v. ) <br> ) <br> QUARTERS HOLDING GmbH ) <br> ) <br>      Defendant. ) | Civil Action No. 20-cv-3480 <br><br><br><br><br><br><br><br> COMPLAINT |

---

## PRELIMINARY STATEMENT

1. This is an action by Cedar Holdings, LLC and JM Holdings 1 LLC (together, "Cedar") to enforce an agreement entered into by Quarters Holding GmbH (f/k/a Medici Living Holding GmbH) ("Quarters"), a wealthy German real estate investing entity, to guaranty over $8 million in payments under a commercial lease for a multifamily property in Brooklyn.

2. Quarters, a Germany-based multinational company, is seeking to become the "WeWork" of co-living, offering apartment rooms and studio spaces in multi-family dwellings in urban markets through an app that anyone can download. The key to its business model is finding property owners who will renovate to Quarters' specifications and lease to its affiliates, taking on attendant risks, costs, and delays. To attract such owners, Quarters says on its website that "[b]y signing a long-term lease with us, you are guaranteed a fully stabilized building from day one, making the property more attractive to investors."[1] Quarters also promises "additional value" and "higher real estate returns" to property owners, including a "rent premium over

---

[1] https://real-estate-partners.quarters.com/.

traditional multi-family."[2] Knowing that good faith and trust are needed in a long-term business relationship, Quarters promises property owners "[p]artnership from start to finish."[3]

3. As set forth below, in the midst of the current public health emergency, Quarters is not living up to its own lofty language. Instead, it has sought to pull back on its commitments to expand and provide housing in New York City, breaching binding agreements along the way, including by refusing to provide documentation needed for Cedar to obtain financing and by attempting to repudiate a binding lease for a Brooklyn property and related guaranty in their entirety. In its desperation to protect its own bottom line, Quarters has even solicited bank fraud.

4. Cedar thus brings this case to enforce its rights and obtain all remedies afforded by New York law.

## JURISDICTION AND VENUE

5. Plaintiff Cedar is a New Jersey limited liability company. Mark Tress, who is a citizen of the State of New Jersey, is the sole member of Cedar.

6. Plaintiff JM Holdings 1 LLC ("JM") is a New Jersey limited liability company. Mark Tress is the sole member of JM.

7. Quarters is a German corporation with its headquarters in Berlin, Germany. This Court has personal jurisdiction over Quarters, because it consented to the jurisdiction of this Court in the Guaranty.

8. Quarters, either directly or through one or more intermediate entities, exerts full control over Medici 251 DeKalb LLC ("Tenant"), including all of its business decisions. Tenant has no known employees, officers, directors, or shareholders, nor does it hold assets remotely

---

[2] *Id.*

[3] *Id.*

attendant to its large liabilities. Instead, it is merely operated as a shell, *alter ego* company of Quarters.

9. This Court has subject-matter jurisdiction over this dispute under 28 U.S.C. 1332, because it involves the citizens of a state (New Jersey) and a citizen of a foreign state (Germany), and the amount in controversy exceeds $75,000.

10. Venue in this district is proper because the parties agreed it could serve as the forum for any disputes under the Guaranty.

## FACTS

11. In a lease dated July 6, 2019 (the "Lease"), Medici 251 DeKalb LLC ("Tenant") agreed to lease the premises located at 251 DeKalb Avenue in Brooklyn, New York (the "Premises") for a ten-year term, to be used as a "co-living" space consistent with the business model of its parent company, Quarters. To induce Cedar to sign the Lease, Quarters entered into an unconditional, irrevocable guaranty of the Lease (the "Guaranty").

12. After the Lease was executed, Cedar invested large amounts of money, time, attention, and resources to renovate the Premises to Quarters' specifications. This included, for example, expensive, custom renovations to cabinetry, flooring, roofing, floor plans, utilities, and other structural, functional, and cosmetic elements.

13. Project delays associated with renovations to prepare the Premises to Quarters' specifications pushed the projected delivery date for the Premises from late 2019 into early 2020. Tenant, however, told Cedar throughout late 2019 and into 2020 that it fully intended to occupy the Premises. Quarters pressed Cedar to continue investing in renovations to prepare the Premises for occupancy.

14. Through repeated written and oral communications, Tenant expressly waived the right to terminate the Lease after the November 30, 2019 delivery date. Solely by way of example, and without limiting the foregoing:

(i) On December 2, 2019, the first business day following November 30, 2019, a representative of Quarters wrote to Cedar by email asking for "final specs for kitchens and tiles" so that Quarters could approve. The email stated nothing about terminating the Lease and showed full intent to honor it.

(ii) On December 16, 2019, a representative of Quarters wrote to Cedar requesting an update from Cedar's bank and expressing Quarters' desire to complete the project.

(iii) On December 17, 2019, Quarters inquired whether it could replace a letter of credit that had issued from its bank with a bond to provide security for the Lease. Like other communications, this request clearly indicated that Quarters did not intend to terminate the Lease, as interchanging two similar instruments to provide security under the Lease would have been meaningless in that event.

(iv) On or about January 7, 2020, Quarters sent various items of information to Cedar's bank to facilitate obtaining further financing for the project. Again, this would have been unnecessary if Quarters intended to terminate the Lease based on the November 30, 2019 delivery date.

(v) Various representatives of Quarters repeatedly urged Cedar in phone conversations to complete renovations at the Premises, assuring Cedar that they desired and intended to complete the project. At no point during the extensive conversations that

took place between November 30, 2019 and April 15, 2020, did any representative of Quarters or Tenant state a desire or reservation of rights to terminate the Lease.

(vi)   In a January 15, 2020 interview, Quarters' Chief Executive Officer indicated that not only was it was going forward with the new Brooklyn location in Fort Greene, it was "thrilled" about it. As reported by Forbes: "'We're thrilled to continue growing our U.S. footprint in New York City,' Quarters CEO Gunther Schmidt said in a statement. 'New York, particularly Brooklyn, draws young tech and creative entrepreneurs with its vibrant community culture. At Quarters, we provide that same culture through a mix of amenities and programming in deluxe living accommodations at a more affordable price than market rate."

(vii)   On or about January 27, 2020, Quarters unambiguously indicated it was going to proceed with the Lease as agreed and would not terminate it. Specifically, Quarters publicly announced in a press release that it was opening a new Fort Greene, Brooklyn location at the Premises, prominently featuring a photo of the Premises in the article.  https://www.connect.media/quarters-adds-two-brooklyn-co-living-sites/. The article specifically identified its Fort Greene location as the property owned by Cedar. *Id.* The article further acknowledged that the original delivery date in November 2019 was no longer operative, declaring in black-and-white that "[b]oth the North Williamsburg ***and Fort Greene*** sites are expected to deliver ***early this year***" (*i.e.*, 2020). The following image is a screen shot taken of that release:



15.     Throughout the period following November 30, 2019, Cedar continued to perform work to prepare the Premises for Tenant's use and occupancy, including investing over $1 million of funds to make custom alterations.

16.     After recent events relating to the COVID-19 pandemic, Quarters quickly changed its tune. On March 17, 2020, Quarters demanded that, in exchange for an estoppel

6

certificate that it was required to provide pursuant to the Lease, Cedar effectively waive rights to enforce the Lease by signing a document stating incorrectly it was in default.

17. The timeline of events in mid-March paints a clear picture: in light of COVID-19's impact on economic conditions and New York City's emerging status as the global epicenter of the pandemic, Quarters chose to behave opportunistically and in disregard of Cedar's rights. Specifically, after expressly waiving the November 30 delivery date through express written and oral statements, Quarters suddenly began asserting a "default" due the passage of the November 30 date months prior. Those assertions began only after it became clear that COVID-19 was spreading rapidly through New York City.

18. On March 12, 2020, Cedar asked Quarters in writing for an estoppel certificate on Tenant's behalf. Section 21.1 of the Lease unconditionally required Tenant to provide this certificate at Cedar's request. Cedar indicated that the certificate was needed "asap" for funding "next week."

19. On the same date, March 12, 2020, Governor Cuomo announced a ban throughout New York State on mass gatherings of over 500 people, after confirmed COVID-19 cases in the state increased to 325, including 109 new cases.[4]

20. Three days later, on March 15, Governor Cuomo announced that New York City schools would close the following day through at least April 20. Mayor de Blasio also announced that all schools, bars, and dine-in restaurants in the city were to be closed starting 9 a.m. on March 17. Quarters had not yet provided the requested certificate.

---

[4] https://www.governor.ny.gov/news/during-novel-coronavirus-briefing-governor-cuomo-announces-new-mass-gatherings-regulations

21.     The next day, on March 16, 2020, financial markets went into freefall in response to the growing public health and economic contagion from COVID-19. The Dow Jones Industrial Average fell by 2,997 points, the largest single-day point decline in its 123-year history. Quarters had still not provided the requested certificate.

22.     On March 16, 2020, Cedar emailed Quarters requesting an update on the estoppel certificate. Quarters replied that it would "be turning around" the estoppel certificate "tomorrow or Wednesday."

23.     On March 17, 2020, Cedar replied, stating "[p]lease send signed copy today and overnight the original. Let's get funded this week."

24.     In the evening of March 17, 2020, after several additional follow-ups by Cedar, Quarters' in-house counsel sent a "redline" revision of the estoppel certificate to Cedar, which stated that Cedar was in default for not delivering the Premises by November 30, 2019.

25.     Cedar quickly replied to Quarters' redline revision stating "I can not sign acknowledging a default. Sorry." Quarters then replied, stating "[w]e can't sign not listing" the purported default. Quarters asked for a follow-up phone call, suggesting they could "figure something out."

26.     In the ensuing phone call, Quarters suggested that it could issue an estoppel certificate stating there were no uncured defaults under the Lease, which Cedar could then present to its bank to get funding, **if** Cedar would sign a "side letter" stating the opposite. Cedar rejected that proposal immediately as soliciting outright bank fraud.

27.     On April 15, 2020, counsel for Quarters sent Cedar a notice purporting to terminate the Lease based on the passage of the original November 30, 2019, projected delivery date.

28. On April 22, 2020, counsel for Cedar sent a letter to Quarters and its counsel explaining that Quarters had long-since waived any right to terminate the Lease based on the original November 30, 2019 delivery date and demanding that Tenant withdraw the notice and confirm in writing it would perform the Lease.

29. On April 23, 2020, counsel for Cedar sent a notice of default to Quarters with respect to the Guaranty, based on the Tenant's breaches of the Lease as set forth herein.

30. On May 1, 2020, counsel for Defendants replied by letter to Cedar's April 22 and 23 communications. Defendants refused to withdraw their purported notice of termination.

31. Quarters' breaches of the Lease and Guaranty have caused severe harm to Cedar. Cedar has been induced to make significant investments based on Quarters' assurances that Tenant intended to occupy the Premises despite the project delays.

32. Further, Cedar has no realistic way to mitigate damages from the over $8,000,000 of rent and other payments to be made under the Lease, which Quarters has guaranteed but now refuses to honor. Prevailing government orders and social distancing guidelines currently do not allow Cedar to physically show the Premises to another Tenant. And Tenant's breach in refusing to provide a simple estoppel certificate required by the Lease has prevented Cedar from obtaining financing it needs to finish renovating the Premises. Also, as Quarters itself advertises, the Lease offered significant benefits not present for a property owner in traditional multi-family leasing, including no need to create an allowance for vacancies, higher overall investment return rates, higher value to other investors if property were sold, and management services by Quarters, among other benefits. Defendants' repudiation of the Lease has deprived Cedar of each of these benefits and it is entitled to damages exceeding $8 million.

## COUNT I: BREACH OF CONTRACT

33. Plaintiffs incorporate paragraphs 1 through 32 above as if fully stated herein.

34. Tenant entered into a written lease to rent the Premises from Cedar for an agreed term of ten years at a total rent of over $8 million.

35. Quarters has unconditionally guaranteed Tenant's performance of the Lease.

36. Tenant's April 15, 2020 purported termination notice, along with its subsequent refusal to withdraw that notice, constitute an anticipatory breach of all of its obligations under the Lease, whether performance is due now or in the future, entitling Cedar to the full value of the Lease payments due from Tenant as damages.

37. Tenant's refusal to deliver the estoppel certificate required by the Lease was likewise a breach of the Lease that caused damages to Cedar, including but not limited to damages associated with project delays and increased financing and legal costs.

38. Quarters is liable for the entirety of these damages as Guarantor.

39. Quarters is also liable under the terms of the Lease and Guaranty for Cedar's attorney's fees and costs for this action to enforce those agreements.

### COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

40. Plaintiffs incorporate paragraphs 1 through 32 above as if fully stated herein.

41. The Guaranty and the Lease, like all contracts entered into under New York law, contain within them an implied covenant of good faith and fair dealing.

42. Quarters' conduct as described throughout this complaint has been in bad faith and in violation of the implied covenant of good faith and fair dealing.

43. Specifically, Quarters' private and public positions regarding the opening of the Fort Greene location at the Premises, along with its suggestion that Cedar engage in a fraudulent conspiracy involving a "side letter" contradicting representations made to a bank, constitute bad faith.

44. Quarters has been damaged by this conduct as stated herein.

45. Further, Quarters' opportunistic and dishonest conduct constitute an extraordinary showing of a dishonest or disingenuous failure to carry out a contract, subjecting Quarters to punitive damages under New York law.

## COUNT III: PROMISSORY ESTOPPEL

46. Plaintiffs incorporate paragraphs 1 through 32 above as if fully stated herein.

47. In the alternative, and in the event the Lease is for any reason found invalid, unenforceable, or otherwise ineffective to provide an adequate remedy to Cedar, Cedar asserts a claim for promissory estoppel.

48. After November 30, 2019, Quarters repeatedly promised Cedar that it would open at the Premises and would honor the Lease, through both private and public communications described herein.

49. Plaintiffs relied to their detriment on those promises, spending over $1 million to renovate the Premises to Defendant's specifications.

50. Plaintiffs have been damaged by Defendant's false promises in an amount exceeding $1 million.

WHEREFORE, Plaintiffs request that the Court enter a final judgment awarding legal and equitable relief as follows:

1. Monetary damages in an amount to be determined at trial;

2. Pre-judgment and post-judgment interest at the prevailing legal rate of 9%;

3. Punitive damages for Defendant's bad-faith conduct; and

4. Plaintiffs' attorney's fees and costs.

Dated: May 4, 2020

                                                Respectfully submitted,

                                                STEPTOE & JOHNSON LLP

                                                By:  */s/ Nathaniel J. Kritzer*

                                                Nathaniel J. Kritzer
                                                1114 Avenue of the Americas
                                                New York, New York 10036
                                                Tel: (212) 506-3900
                                                Fax: (212) 506-3950
                                                nkritzer@steptoe.com

                                                *Counsel for Plaintiffs*