IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| JM HOLDINGS 1 LLC AND<br>CEDAR HOLDINGS, LLC | )<br>)<br>) | |
| Plaintiffs, | ) | Civil Action No. 1:20-cv-03480-JPO |
| | ) | |
| v. | ) | |
| | ) | |
| QUARTERS HOLDING GmbH | ) | |
| | ) | |
| Defendant. | ) | AMENDED COMPLAINT |

---

## PRELIMINARY STATEMENT

1. This is an action by Cedar Holdings, LLC and JM Holdings 1 LLC (together, "Cedar") to enforce an agreement entered into by Quarters Holding GmbH (f/k/a Medici Living Holding GmbH) ("Quarters"), a wealthy German real estate investing entity, to guaranty over $8 million in payments under a commercial lease for a multifamily property in Brooklyn.

2. Quarters, a Germany-based multinational company, is seeking to become the "WeWork" of co-living, offering apartment rooms and studio spaces in multi-family dwellings in urban markets through an app that anyone can download. The key to its business model is finding property owners who will renovate to Quarters' particular specifications and lease to its affiliates, taking on attendant risks, costs, and delays. To attract such owners, Quarters has stated on its website that "[b]y signing a long-term lease with us, you are guaranteed a fully stabilized building from day one, making the property more attractive to investors." Quarters also promised "additional value" and "higher real estate returns" to property owners, including a "rent premium

over traditional multi-family." Knowing that good faith and trust are needed in a long-term business relationship, Quarters promised property owners "[p]artnership from start to finish."[1]

3. As set forth below, in the midst of the current public health emergency, Quarters is not living up to its own lofty language. Instead, it has sought to pull back on its commitments to expand and provide housing in New York City, breaching binding agreements along the way, including by refusing to provide documentation needed for Cedar to obtain financing and by attempting to repudiate a binding lease of a Brooklyn property and related guaranty in their entirety. In one instance, Quarters even solicited bank fraud to meet its needs.

4. Empty promises are becoming Quarters' "brand." Quarters induces landlords and tenants alike by promises of efficient and effective property management, but actually it offers nothing of the sort. Instead, as described below, Quarters has received criticism for "random" charges, extreme disorganization, and its total lack of care in management.

5. Not only has Quarters failed to honor its obligations to Plaintiffs, Quarters is committed to concealing the truth about its misconduct. After this lawsuit was filed, Quarters complained profusely in its motion to dismiss that the case has been covered by the press. But it was Quarters who hyped the opening of its Fort Greene location to the public—making its attempt to opportunistically back out of its own commitment just as newsworthy.

6. Even worse, Quarters drafted (and threatened to file) a frivolous motion for sanctions based largely on the fact that the case received press coverage, which Quarters had

---

[1] These statements previously appeared on the webpage published at the URL https://real-estate-partners.quarters.com. After this lawsuit was filed, Quarters promptly deleted this page from its site entirely. As of June 9, 2020, this page has been taken down and the URL leads to a statement "Website is Offline. This project has been unpublished."

previously invited for this exact property. Quarters' heavy-handed, frivolous threats will not silence Plaintiffs or deter them from pursuing their rights.

## PARTIES

7. Plaintiff Cedar is a New Jersey limited liability company. Mark Tress, who is a citizen of the State of New Jersey, is the sole member of Cedar.

8. Plaintiff JM Holdings 1 LLC ("JM") is a New Jersey limited liability company. Mark Tress is the sole member of JM. JM holds a 99% interest in the Premises (defined below).

9. There are three LLCs with ownership interests in the Premises. By prior understanding of the parties, Cedar has maintained the right to manage and direct all activities relating to the Premises, including this lawsuit, at all relevant times. Further, through a written agreement of all landlord LLCs dated June 9, 2020 and deemed effective April 1, 2020, the remaining two landlord LLCs (Roth Innovations LLC and LPC Properties LLC) have assigned all rights and causes of action regarding this matter to Cedar.

10. The remaining two landlord LLCs not joined as Plaintiffs together hold only a 1% interest in the Premises. Because those parties have assigned their claims, their interests are *de minimis* to begin with, and their interests are adequately represented by Cedar in any event, they have not been joined to this case and their presence is in no way necessary.

11. Quarters is a German corporation with its headquarters in Berlin, Germany. This Court has personal jurisdiction over Quarters, because it consented to the jurisdiction of this Court in the Guaranty.

12. Quarters, either directly or through one or more intermediate entities, exerts full control over Medici 251 DeKalb LLC ("Tenant"), including all of its business decisions.

13. Upon information and belief, Tenant is a shell company with substantially no assets other than the Lease, and it has no independent personnel, offices, or operations.

14. Each building within the United States that Quarters operates is associated with a unique LLC that is similarly named after the address of the property.

15. Quarters has expressly agreed that recovery may be had against it "in any independent action . . . ***without [Plaintiffs] first asserting, prosecuting, or exhausting any remedy or claim against Tenant***." Tenant is therefore ***not*** a necessary party to this action and Quarters has waived any such argument.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this dispute under 28 U.S.C. 1332, because it involves the citizens of a state (New Jersey) and a citizen of a foreign state (Germany), and the amount in controversy exceeds $75,000.

17. Venue in this district is proper because the parties agreed it could serve as the forum for any disputes under the Guaranty.

## FACTS

18. In August 2017, the three landlord LLCs entered into a lease agreement with a different co-living firm for the development of 251 DeKalb Avenue in Brooklyn, New York (the "Premises").

19. On or around April 2019, Plaintiffs communicated with representatives from Quarters. Quarters made promises of "additional value" to Plaintiffs—boasting that they could bring Plaintiffs around $300,000 more in annual returns, better management and operations, and greater financial stability.

20. In reliance on Quarters' promises, Plaintiffs paid a fee of $250,000 to terminate the prior lease and partner with Quarters.

21. In a lease dated July 6, 2019 (the "Lease"), Medici 251 DeKalb LLC ("Tenant") agreed to lease the Premises for a ten-year term, to be used as a "co-living" space consistent with

the business model of its parent company, Quarters. To induce Cedar to sign the Lease, Quarters entered into an unconditional, irrevocable guaranty of the Lease (the "Guaranty").

22. After the Lease was executed, Cedar invested substantial amounts of money, time, and resources to renovate the Premises to Quarters' particular specifications for its co-living spaces. This included, for example, expensive renovations to cabinetry, flooring, roofing, floor plans, utilities, and other structural, functional, and cosmetic elements. In short, Cedar has faithfully performed its obligations under the Lease.

23. When the Lease was negotiated, the parties discussed estimated timetables for completion of the extensive, custom renovations that Quarters demanded. All parties recognized that the timetables were estimates, and the Lease clearly contained no representation, warranty, or covenant that the renovations would be completed by November 30, 2019. Instead, the Lease gave Tenant a waivable right to terminate in the event the Premises was not delivered by that date.

24. Project delays associated with renovations to prepare the Premises to Quarters' specifications pushed the projected delivery date for the Premises from late 2019 into 2020.

25. As the project progressed, media reports and online reviews confirmed that Quarters' business was not having the operational success that it promised to Plaintiffs (and to others). These accounts—which could not contrast more sharply with the story Quarters peddled to Plaintiffs to induce them to terminate their prior contract and sign a lease with Tenant—reveal Quarters' total lack of managerial competence, its dissatisfied customer base, its undisclosed and illegal charges to tenants, its "random" rent increases, and the dilapidated properties operated under its brand. By way of illustration, commenters stated:

  (i)  "Random rent increases, random hidden charges that they don't tell you about. Spaces that are shared by the entire apartment are often left unclean (***the bathrooms are absolutely disgusting***). Terrible security - ***multiple packages and my bike have been stolen***. They don't have security cameras and random people can get into the apartment complex."[2]

  (ii)  "***Don't do it! Just... don't***. Your experience here will cause you immense stress. I lived in the Chicago Quarters location for 3 months and in that time the following things happened REPEATEDLY: ***I was charged incorrect amounts in rent***, my key fob suddenly stopped working THREE times and I was locked out of my apartment at night with little to no response from management, my roommates and I were charged 'sneaky' fees, packages were stolen from the building with no explanation or rectification from the management, ***the communal spaces in the building were filthy and not cleaned, the walls are extremely thin so you can hear and smell everything (and I do mean everything) happening in your neighbors' apartment***, and management exhibited extreme disorganization and lack of care for every issue we brought up with them."[3]

  (iii)  "[T]hey have yet to refund my first months rent, deposit and application fees, totally over $3600. ***The application fee was also $299, in direct violation of NYC's***

---

[2] https://www.yelp.com/biz/quarters-co-living-fulton-market-chicago-chicago (last visited June 12, 2020). Emphasis is added throughout unless otherwise noted

[3] *Id.*

6

*$20 application fee law*. I have contacted them numerous times since only for them to say they're 'working on it.'"[4]

26.     Tenant, however, told Cedar throughout late 2019 and into 2020 that it fully intended to occupy the Premises. Quarters consistently pressed Cedar to continue investing in renovations to prepare the Premises for occupancy, and to faithfully perform its obligations under the Lease as it had at all times prior.

27.     Through repeated written and oral communications, Tenant waived the right to terminate the Lease after the November 30, 2019 delivery date. Solely by way of example, and without limiting the foregoing:

(i)     On December 2, 2019, **the first business day** following November 30, 2019, a representative of Quarters wrote to Cedar by email asking for "final specs for kitchens and tiles" that Cedar was installing so that Quarters could approve. The email stated nothing about terminating the Lease and showed full intent to honor it.

(ii)    On December 16, 2019, a representative of Quarters wrote to Cedar requesting an update from Cedar's bank and expressing Quarters' desire to complete the project.

(iii)   On December 17, 2019, Quarters inquired whether it could replace a letter of credit that had issued from its bank with a bond to provide security for the Lease. Like other communications, this request would have been nonsensical if Quarters and Tenant intended to terminate the Lease (or believed there to be a breach).

---

[4] https://www.yelp.com/biz/quarters-east-village-new-york (last visited June 12, 2020).

(iv) On or about January 7, 2020, Quarters encouraged Cedar to obtain additional financing for the project—providing Cedar with numerous pieces of information to ensure that the financing would be in place. Again, this would have been unnecessary if Quarters and Tenant intended to terminate the Lease based on the November 30, 2019 delivery date.

(v) On top of its written communications, Quarters repeatedly urged Cedar in phone conversations to complete renovations at the Premises. In these discussions, Tenant (acting through Quarters) assured Cedar that it desired and intended to complete the project, continue the Lease, and occupy the Premises regardless of the November 30, 2019 date in the Lease. Neither Quarters nor Tenant ever stated any desire or intention to terminate the Lease in any of these discussions, in fact indicating the exact opposite through their conduct and express statements.

(vi) In a January 15, 2020 interview, Quarters' Chief Executive Officer indicated that not only was Quarters going to follow through with the Lease and open a location at the Premises, it was "*thrilled*" about it. As reported by *Forbes* in an article that celebrated the forthcoming "outdoor patio and courtyard" at the Fort Greene location: "'We're thrilled to continue growing our U.S. footprint in New York City,' Quarters CEO Gunther Schmidt said in a statement. 'New York, particularly Brooklyn, draws young tech and creative entrepreneurs with its vibrant community culture. At

Quarters, we provide that same culture through a mix of amenities and programming in deluxe living accommodations at a more affordable price than market rate."[5]

(vii) On or about January 27, 2020, Quarters again unambiguously indicated it was going to proceed with the Lease as agreed and would not terminate it. This time, Quarters publicly announced in a press release that it was opening a new Fort Greene, Brooklyn location at the Premises, prominently featuring a photo of the Premises in the article.[6] The article specifically identified its Fort Greene location as the property owned by Cedar. The article further acknowledged that the original delivery date in November 2019 was no longer operative, declaring in black-and-white that "[b]oth the North Williamsburg *and Fort Greene* sites are expected to *deliver early this year*" (*i.e.*, 2020). The following image is a screen shot taken of that release:

---

[5] https://www.forbes.com/sites/heathersenison/2020/01/15/global-co-living-brand-quarters-announces-expansion-to-brooklyn/#248ca12e1215 (last visited June 12, 2020).

[6] https://www.connect.media/quarters-adds-two-brooklyn-co-living-sites/. (last visited June 12, 2020).



28.     Through these communications and others, the Parties reached an unambiguous understanding that, notwithstanding the passage of the November 30, 2019 date, the project would go forward and the Lease would not be terminated.

29.     Quarters initially indicated that it would comply with its private and public promises to go forward with the anticipated project at the Premises. Throughout the period following November 30, 2019, Cedar continued to perform work to prepare the Premises for Tenant's use and occupancy, including investing over $1 million of funds to make custom alterations, often at Quarters' specific direction. Neither Quarters nor Tenant ever once made any suggestion that it intended to cancel the contract or that a default occurred.

10

30. But when the COVID-19 pandemic struck New York City, Quarters quickly changed its tune. On March 17, 2020, Quarters demanded that, in exchange for an estoppel certificate that it was required to provide pursuant to the Lease, Cedar sign a document that incorrectly stated it was in default of the Lease.

31. The timeline of events in mid-March paints a clear picture: in light of COVID-19's impact on economic conditions and New York City's emerging status as the global epicenter of the pandemic, Quarters chose to behave opportunistically and in disregard of Cedar's rights. Specifically, after expressly waiving the November 30 delivery date through express written and oral statements, Quarters suddenly began asserting a "default" due to the passage of the November 30 date months prior. Those assertions began only *after* it became clear that the rapid spread of COVID-19 through New York City was going to lead to widespread economic decline.

32. On March 12, 2020, Cedar asked Quarters in writing for an estoppel certificate on Tenant's behalf. Section 21.1 of the Lease unconditionally required Tenant to provide this certificate at Cedar's request. Cedar requested the certificate "asap" for funding "next week."

33. On the same date, March 12, 2020, Governor Cuomo announced a ban throughout New York State on mass gatherings of over 500 people, after confirmed COVID-19 cases in the state increased to 325, including 109 new cases.[7]

34. Three days later, on March 15, Governor Cuomo announced that New York City schools would close the following day through at least April 20. Mayor de Blasio also announced

---

[7] https://www.governor.ny.gov/news/during-novel-coronavirus-briefing-governor-cuomo-announces-new-mass-gatherings-regulations (last visited June 12, 2020).

that all schools, bars, and dine-in restaurants in the city were to be closed starting 9 a.m. on March 17. Quarters had not yet provided the requested certificate.

35. The next day, on March 16, 2020, financial markets went into freefall in response to the growing public health and economic contagion from COVID-19. The Dow Jones Industrial Average fell by 2,997 points, the largest single-day point decline in its 123-year history. Quarters had still not provided the requested certificate.

36. On March 16, 2020, Cedar emailed Quarters requesting an update on the estoppel certificate. Quarters replied that it would "be turning around" the estoppel certificate "tomorrow or Wednesday."

37. On March 17, 2020, Cedar replied, stating "[p]lease send signed copy today and overnight the original. Let's get funded this week."

38. In the evening of March 17, 2020, after additional follow-ups by Cedar, Quarters' in-house counsel sent a "redline" revision of the estoppel certificate to Cedar, which stated that Cedar was in default for not delivering the Premises by November 30, 2019, even though the Lease contained no representation, warranty, or covenant that the Premises would be delivered by that date. Nor had Tenant ever even purported to notice any default based on passage of that date.

39. Cedar quickly replied to Quarters' redline revision stating "I can not sign acknowledging a default. Sorry." Quarters then replied, stating "[w]e can't sign not listing" the purported default. Quarters subsequently asked for a follow-up phone call, suggesting they could "figure something out."

40. In the ensuing phone call, Quarters suggested that it could issue an estoppel certificate stating there were no uncured defaults under the Lease, which Cedar could then

present to its bank to get funding, *if* Cedar would sign a "side letter" stating the opposite. Cedar rejected that proposal immediately as soliciting outright bank fraud.

41. On April 15, 2020, counsel for Quarters sent Cedar a notice purporting to terminate the Lease based on the passage of the original November 30, 2019, projected delivery date.

42. On April 22, 2020, counsel for Cedar sent a letter to Quarters and its counsel explaining that Quarters had long-since waived any right to terminate the Lease based on the original November 30, 2019 delivery date and demanding that Tenant withdraw the notice and confirm in writing it would perform the Lease.

43. On April 23, 2020, counsel for Cedar sent a notice of default to Quarters with respect to the Guaranty, based on the Tenant's breaches of the Lease as set forth herein.

44. On May 1, 2020, counsel for Defendants replied by letter to Cedar's April 22 and 23 communications. Defendants refused to withdraw their purported notice of termination.

45. Quarters' conduct—in breach of the Lease and Guaranty—has caused severe harm to Cedar. Cedar has been induced to make significant investments based on Quarters' repeated assurances, including that Tenant intended to occupy the Premises despite the project delays.

46. Further, Cedar presently has no realistic way to mitigate damages from the over $8 million of rent and other payments to be made under the Lease, which Quarters has guaranteed but now refuses to honor. Since Quarters' breach of the Guaranty, prevailing government orders and social distancing guidelines have restricted Cedar's ability to physically show the Premises to another Tenant. And Tenant's breach in refusing to provide an estoppel certificate required by the Lease has prevented Cedar from obtaining financing that Tenant

agreed to help obtain. Also, as Quarters itself has boasted, the Lease, if performed by Tenant, would have provided significant benefits not typically present for a property owner in the multi-family leasing space—including no need to create an allowance for vacancies, higher overall investment return rates, higher value to other investors if property were sold, and management services by Quarters, among other benefits. Defendants' repudiation of the Lease has deprived Cedar of each of these benefits and it is entitled to damages exceeding $8 million.

## COUNT I: BREACH OF CONTRACT

47. Plaintiffs incorporate paragraphs 1 through 46 above as if fully stated herein.

48. Tenant entered into a written lease to rent the Premises from Cedar for an agreed term of ten years at a total rent of over $8 million.

49. Plaintiffs have performed their obligations under the Lease.

50. Quarters has unconditionally guaranteed Tenant's performance of the Lease.

51. Tenant's April 15, 2020 purported termination notice, along with its subsequent refusal to withdraw that notice, constitute an anticipatory breach of all of its obligations under the Lease, whether performance is due now or in the future, entitling Cedar to compensatory damages equal to the full value of the economic and financial benefit of the Lease.

52. Tenant's refusal to deliver the estoppel certificate required by the Lease was likewise a breach of the Lease that caused damages to Cedar, including but not limited to damages associated with project delays and increased financing and legal costs.

53. Quarters is liable for the entirety of these damages as Guarantor.

54. Quarters is also liable under the terms of the Lease and Guaranty for Cedar's attorney's fees and costs for this action to enforce those agreements.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

55. Plaintiffs incorporate paragraphs 1 through 46 above as if fully stated herein.

56. The Guaranty and the Lease, like all contracts entered into under New York law, contain within them an implied covenant of good faith and fair dealing.

57. Quarters' conduct as described throughout this complaint has been in bad faith and in violation of the implied covenant of good faith and fair dealing.

58. For example, Quarters' repeated representations, in private and public, regarding the opening of a Fort Greene location at the Premises, while it supposedly believed Plaintiffs to be in default, constitutes bad faith.

59. Likewise, Quarters' suggestion that Cedar engage in a fraudulent conspiracy involving a "side letter" that would squarely contradict representations made to a bank, constitutes bad faith.

60. Plaintiffs have been damaged by this conduct as stated herein.

61. Further, Quarters' knowing, opportunistic, and dishonest conduct constitute an extraordinary showing of a dishonest or disingenuous failure to carry out a contract, subjecting Quarters to punitive damages under New York law.

## COUNT III: PROMISSORY ESTOPPEL

62. Plaintiffs incorporate paragraphs 1 through 46 above as if fully stated herein.

63. In the alternative, and in the event the Lease is for any reason found invalid, unenforceable, no longer in effect, or otherwise ineffective to provide an adequate remedy to Cedar, Cedar asserts a claim for promissory estoppel.

64. After November 30, 2019, Quarters repeatedly promised Cedar that it would open at the Premises and would honor the Lease, through both private and public communications described herein.

65. Plaintiffs relied to their detriment on those promises, spending over $1 million to renovate the Premises to Plaintiffs' specifications.

66. Plaintiffs have been damaged by Plaintiffs' false promises in an amount exceeding $1 million.

WHEREFORE, Plaintiffs request that the Court enter a final judgment awarding legal and equitable relief as follows:

1. Monetary damages in an amount to be determined at trial;

2. Pre-judgment and post-judgment interest at the prevailing legal rate of 9%;

3. Punitive damages for Defendant's bad-faith conduct; and

4. Plaintiffs' attorney's fees and costs.


Dated: June 12, 2020

                                              Respectfully submitted,

                                              STEPTOE & JOHNSON LLP

                                              By:  */s/ Nathaniel J. Kritzer*

                                              Nathaniel J. Kritzer
                                              1114 Avenue of the Americas
                                              New York, New York 10036
                                              Tel: (212) 506-3900
                                              Fax: (212) 506-3950
                                              nkritzer@steptoe.com

                                              *Counsel for Plaintiffs*