**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
JM HOLDINGS 1 LLC and CEDAR HOLDINGS, LLC,

                                     Plaintiffs,

           v.

QUARTERS HOLDING GmbH,

                                   Defendant.
-------------------------------------------------------------------x

Case No. 1:20-cv-03480 (JPO)

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT**
**<u>OF ITS MOTION FOR IMPOSITION OF SANCTIONS PURSUANT TO RULE 11</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT FACTS ............................................................................................... 5

    A.  The Lease & Guaranty ............................................................................... 5

    B.  Plaintiffs Failed to Deliver the Premises ...................................................... 6

    C.  Plaintiffs' Actions After Receiving Tenant's Termination Notice .......................... 10

   I.   RULE 11 SANCTIONS ARE WARRANTED AGAINST PLAINTIFFS ...................... 13

    A.  Legal Standard    13

    B.  Plaintiffs Refuse to Withdraw Their Frivolous Claims .................................... 15

    C.  Sanctions Are Warranted Because Plaintiffs  Deliberately Made False
        Allegations in the Complaint ................................................................... 18

    D.  Sanctions Are Warranted Because Plaintiffs Filed the Complaint and
        Amended Complaint for Improper Purposes ................................................ 20

   II.  MONETARY SANCTIONS ARE WARRANTED ........................................... 22

CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baasch v. Reyer*,
    827 F. Supp. 940 (E.D.N.Y. 1993) ........................................................................19

*Bello v. Barden Corp.*,
    2006 WL 2827091 (D. Conn. Sept. 29, 2006), *aff'd in part sub nom. Umeugo*
    *v. Barden Corp.*, 307 F. App'x 514 (2d Cir. 2009)...................................................21

*Bonded Life Fund, LLC v. AXA Equitable Life Ins. Co.*,
    No. 13-cv-5451, 2014 WL 930059 (S.D.N.Y. Feb. 28, 2014) ................................22

*Caisse Nationale de Credit Agricole-CNCA, New York Branch v. Valcorp, Inc.*,
    28 F.3d 259 (2d Cir. 1994).............................................................................14, 22

*Colliton v. Cravath, Swaine & Moore LLP*,
    2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535
    (2d Cir. 2009)........................................................................................................21

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990)...............................................................................................14

*Cross & Cross Props., Ltd. v. Everett Allied Co.*,
    886 F.2d 497 (2d Cir. 1989)...........................................................................14, 15

*Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*,
    No. 16-cv-1318, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017) ...........................14

*Katzman v. Victoria's Secret Catalogue*,
    167 F.R.D. 649 (S.D.N.Y. 1996) ..........................................................................15

*Knipe v. Skinner*,
    19 F.3d 72 (2d Cir. 1994).......................................................................................15

*Maflo Holding Corp. v. S.J. Blume, Inc.*,
    308 N.Y. 570 (N.Y. 1955)......................................................................................16

*Margo v. Weiss*,
    213 F.3d 55 (2d Cir. 2000).....................................................................................14

*McCready v. Lindenborn*,
    172 N.Y. 400 (N.Y. 1902) .....................................................................................16

*Morley v. Ciba-Geigy Corp.*,
    66 F.3d 21 (2d Cir. 1995).......................................................................................19

*In re Sept. 11th Liab. Ins. Coverage Cases*,
    243 F.R.D...............................................................................................................23

*United States v. Int'l Bhd. Of Teamsters*,
    948 F.2d 1338 (2d Cir. 1991)...........................................................................19

**Rules**

Fed. R. Civ. P. 11 ............................................................................................ *passim*

Fed. R. Civ. P. 11(b) .............................................................................................13

Fed. R. Civ. P. 11(b)(1).........................................................................................19

Fed. R. Civ. P. 11(c) .............................................................................................13

Fed. R. Civ. P. 11(c)(2).....................................................................................12, 23

Fed. R. Civ. P. 11(c)(4).........................................................................................23

Defendant Quarters Holding GmbH ("Quarters or Defendant") respectfully submits this memorandum of law in support of its motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure and the Court's inherent power against Plaintiffs JM Holdings 1 LLC ("JM Holdings") and Cedar Holdings, LLC ("Cedar," and collectively with JM Holdings, "Plaintiffs") for pursuing frivolous claims against Defendant, misleading the Court and other sanctionable conduct.

## PRELIMINARY STATEMENT

Rule 11 prohibits parties from filing pleadings without adequate investigation and/or with knowledge that the claims asserted therein lack merit. Plaintiffs have ignored the clear mandates of Rule 11 by instituting this action.

Plaintiffs' initial Complaint was a plain abuse of Court and party resources. It was a baseless and wrongful attempt to use the publicity generated from Plaintiffs' frivolous allegations and claims to pressure Quarters into abandoning its lease termination notice. And, it was designed to use the existence of a filed complaint to leak baseless allegations to the press to damage Quarters' reputation in the industry, specifically the specious allegation that Defendant had suggested committing bank fraud, and to take Tenant's security deposit under the claim of a lease "default."

In response to Plaintiffs' initial Complaint, Defendant served Plaintiffs with a Rule 11 safe harbor letter on June 2, 2020, demanding that Plaintiffs withdraw the Complaint. In an apparent show of defiance, Plaintiffs doubled-down on their baseless allegations by filing an amended complaint on June 12, 2020 (the "Amended Complaint"). This Amended Complaint exposes Plaintiffs true purpose with this litigation, defaming Quarters and harming its reputation in the marketplace. Other than adding some conclusory allegations (that are still contradicted by the

Amended Complaint and the terms of the lease) and reciting certain required legal elements to support their claims, Plaintiffs' Amended Complaint does nothing more than expand on allegations that Quarters is a terrible company.  As such, Defendant elected to apply its motion to dismiss, dated May 22, 2020 to the Amended Complaint, and to restart the clock on Defendant's Rule 11 motion for sanctions by serving another safe harbor letter, dated June 23, 2020.  Plaintiffs' continued use of the court system to pursue baseless claims for the sole purpose of harming Quarters' reputation warrants sanctions.

This case concerns a dispute between a landlord and tenant, where the tenant had a clear right in the lease agreement (the "Lease") to terminate in the event the landlord failed to deliver the premises by November 30, 2019.  That is what happened.  As of April 15, 2020, landlord had still not delivered the premises to tenant, the rent commencement date had not occurred, and more than four months from the outside delivery date of the premises had passed without any indication that landlord would soon deliver the premises.  For that reason, the tenant, Medici 251 DeKalb LLC ("Tenant"), exercised its termination rights under Section 3.5 of the Lease on April 15, 2020.

Upon receiving the tenant's termination notice, Plaintiffs' principal, Mark Tress, began threatening Tenant and Quarters in order to attempt to frighten Tenant into withdrawing its termination notice and waiving all its rights under the Lease, including significant rent abatements that the landlord could not afford.  On April 16, 2020, Mr. Tress sent an email to Tenant threatening criminal prosecution for a non-existent crime – "fraudulent cancellation."  That same evening, Mr. Tress called a Quarters' employee and threatened to "go to the press" and attempt to destroy Quarters' brand and reputation in the marketplace if Tenant did not withdraw its termination notice.  When Tenant refused to give in to Mr. Tress' threats, Plaintiffs commenced this action against Quarters to use the litigation privilege as a cover to damage Quarters' reputation.

The Amended Complaint, however, is legally baseless, contains deliberate falsehoods, and was filed to harass and damage Quarters' reputation.  Accordingly, sanctions are warranted to deter Mr. Tress and his entities from engaging in this behavior again.

First, the Amended Complaint, as with the initial Complaint, is meritless.  The Amended Complaint is ripe with frivolous, baseless allegations and claims that are barred by the terms of the Lease and Guaranty as well as clear, well-settled New York law.  By way of example, Plaintiffs claim entitlement to more than $8 million in future rent, even though the Lease does not contain a rent acceleration clause and such claims are barred by more than a century of New York law. Further, in order to avoid the landlord's express obligation under the lease to mitigate its damages, Plaintiffs make the absurd and patently frivolous allegation that they cannot mitigate at all during the next decade of the term of the lease because "prevailing government orders and social distancing guidelines have restricted [Plaintiffs'] ability to physically show the Premises to another [t]enant." (Amended Complaint, ¶46).  Whatever one thinks of the current governmental orders, all public health and governmental officials agree that those orders will be (and in fact already are being) relaxed and so the landlord will have more than enough ability over the course of the next decade to show the premises to multiple prospective tenants.

Second, in order to garner media attention, Plaintiffs falsely allege in the Amended Complaint (as they did in the initial Complaint) that Quarters had attempted to engage in bank fraud.  In order to make these allegations seem legitimate, Plaintiffs cite to correspondence between the Lease Parties.   However, Plaintiffs deliberately cherry-picked from this correspondence and omitted critical context: the parties were discussing amending the Lease, not executing an illegal "side letter" to deceive Landlord's lender.  Despite the fact that Defendant filed a motion to dismiss on this basis, sent a Rule 11 safe harbor letter with a draft sanctions

motion that identified this deception, Plaintiffs consciously failed to correct this omission in the Amended Complaint.  Plaintiffs' continued practice of intentionally omitting this context warrants sanctions.

There is only one reason why Plaintiffs would omit these statements.  That reason is to accomplish precisely what Mr. Tress initially threatened: criminal prosecution and a press campaign designed to harm Quarters' brand and reputation.  And a press campaign is what followed.  Shortly after the initial Complaint was filed, The Real Deal picked it up and ran a story concerning Plaintiffs' Complaint and, among other things, the allegations that Quarters had attempted bank fraud.  The allegations were frivolous, and Plaintiffs knew them to be frivolous.

Mr. Tress' conduct *after* the Complaint was filed confirms Plaintiffs' improper purpose. After The Real Deal article was published, Mr. Tress called a Quarter's employee on a "No Caller ID" number to gloat about the article.  Mr. Tress also texted the article to one of Quarters' former employees asking, "Saw this?."  Plaintiffs also tried to use the Complaint as a basis to "settle," seeking that Tenant again withdraw its termination notice.

Sanctions are warranted here due to Plaintiffs' continued pursuit of baseless claims despite warning and in order to deter Mr. Tress and his entities from engaging in such an abuse of the judicial process again.  Accordingly, Quarters respectfully requests that the Court award Defendant all of its costs and fees incurred in defending itself, order Mr. Tress to return the Security Deposit with interest, and bar all of Plaintiffs' claims.

# RELEVANT FACTS[1]

### A. The Lease & Guaranty

As explained more fully in Defendant's motion to dismiss the Amended Complaint, effective July 6, 2019, Medici 251 DeKalb LLC ("Tenant") entered into a Lease Agreement (the "Lease") with Plaintiff JM Holdings 1, LLC, non-party Roth Innovations LLC, and non-Party LPC Properties LLC (collectively, "Landlord")[2] for the premises located at 251 DeKalb Avenue, Brooklyn, New York 11205 (the "Premises"). (Lease, ECF No. 11-1.)   At the same time, Defendant Medici Living Holding GmbH, n/k/a Quarters Holding GmbH entered into the Guaranty of Lease (the "Guaranty") with Landlord. (ECF No. 11-2.) [3]

The Lease required "Landlord, at Landlord's sole cost and expense, [to] complete the renovation of the Building … ('Landlord's Work') in order that the completion of Landlord's Work shall provide a 'turn-key' build-out of the Premises for Tenant as of the Delivery Date…." (Lease, § 3.1.)   The Lease Parties further agreed in Section 3.5 of the Lease that Tenant would have the right, "in its sole discretion" to elect to terminate the Lease or take a rent abatement in the event Landlord delivered the Premises after November 30, 2019 (the "Outside Delivery Date"). (Lease, § 3.5.)

---

[1] Defendant respectfully refers the Court to its motion to dismiss the Complaint, which Defendant elected to apply to the Amended Complaint, for a full recitation of the facts and bases for dismissal.  (ECF No. 11.)

[2] Landlord and Tenant are collectively referred to herein as the "Lease Parties".

[3] In the initial Complaint, Plaintiffs did not even commence the action on behalf of the Landlord entities identified in the Lease and Guaranty.  Instead, Plaintiffs brought the claims on behalf of Plaintiff JM Holdings (whose interests represented only 1/3 of the landlord parties in the Lease and Guaranty) and Plaintiff Cedar Holdings LLC, who was not a party to either contract.  In the Amended Complaint, Plaintiffs contend that the other two landlords "assigned all rights and causes of action regarding this matter" to Plaintiffs on June 9, 2020, though the terms of the assignment are not included in the Amended Complaint and the assignment is not attached to the Amended Complaint. (Amended Complaint ¶ 9.)

The Lease Parties also agreed to provide certain estoppel certificates within fifteen (15) Business Days of a demand.  Specifically, in Section 21.1 of the Lease, Tenant agreed to "execute and deliver an estoppel certificate certifying," among other things "(v) that Tenant has no knowledge of any then uncured defaults by Landlord under this Lease (*or, if Tenant has such knowledge, specifying them in detail*)…."  (*Id.* § 21.1) (emphasis added).

The Lease Parties also contemplated and included in the Lease provisions relating to damages.  In particular, the Lease Parties did not include an acceleration of rent provision in the Lease.  Rather, the Lease Parties agreed that Landlord would only have the "right, from time to time, to recover from Tenant … all Rent and any other sums accruing *as they become due under this Lease*…., subject, however, to set-off for sums received by Landlord in mitigation of its damages…." (*Id.* §  19.3.)

## B.  Plaintiffs Failed to Deliver the Premises

The Amended Complaint admits that Landlord encountered "[p]roject delays associated with renovations to prepare the Premises to [Tenant's][4] specifications [that] pushed the projected delivery date for the Premises from late 2019 into 2020."  (Amended Complaint ¶ 24; *but see* Complaint ¶ 13 claiming delivery date was pushed to "early 2020.")  This is an admission that Landlord did not deliver the Premises by the Outside Delivery Date and that Tenant had the right "in its sole discretion" under Section 3.5 of the Lease to elect to terminate or take a rent abatement.

Recognizing that Landlord never delivered the Premises, Plaintiffs allege for the first time in the Amended Complaint that "the timetables" in the Lease for Landlord's delivery of the

---

[4] Throughout the Amended Complaint, as in the initial Complaint, Plaintiffs refer to purported breaches of the Lease by "Quarters." Quarters is not a party to the Lease and did not perform Tenant's obligations under the Lease.  For purposes of this motion and the Court's ease of understanding of respective parties' rights and interests under the Lease and Guaranty, Defendant will refer to "Tenant" when referencing Plaintiffs' allegations relating to purported breaches of the Lease.

Premises were estimates and "the Lease clearly contained no representation, warranty, or covenant that the renovations would be completed by November 30, 2019." (Amended Complaint ¶ 23.) This is false. Indeed, Article 3 of the Lease, which includes Landlord's delivery obligations, is clearly titled, "***Landlord's Representations and Warranties and Covenants; Delivery of Premises***" (Lease Art. 3) (emphasis in original.) Section 3.1 of the Lease then plainly provides that "Landlord … ***shall complete the renovation of the Building*** … in order that the completion of Landlord's Work shall provide a 'turn-key' build-out of the Premises for Tenant ***as of the Delivery Date***." (*Id.* § 3.1) (emphasis added.)

The Amended Complaint further alleges that in March 2020, Landlord had still not delivered the Premises, but asked Tenant "in writing for an estoppel certificate" and that "[Landlord] requested the certificate 'asap' for funding 'next week.'" (Amended Complaint ¶ 32.) After review of the estoppel certificate, on March 17, 2020 "[Tenant's] in-house counsel sent a 'redline' revision of the estoppel certificate to [Landlord], which stated that [Landlord] was in default for not delivering the Premises by November 30, 2019." (*Id.* ¶ 38.)

As in the initial Complaint, Plaintiffs then cherry-pick allegations to include in the Amended Complaint, omitting critical context, so that Plaintiffs can assert that Quarters suggested the parties engage in "bank fraud."

First, Plaintiffs allege that "Cedar quickly replied … stating 'I can not sign acknowledging a default. Sorry.'" (*Id.* ¶ 39.) Plaintiffs then allege the following:

> "Quarters then replied, stating '[w]e can't sign not listing' the purported default. Quarters <u>subsequently</u> asked for a follow-up phone call, suggesting they could 'figure something out.'"

(*Id.*)[5]

As Plaintiffs now admit in the Amended Complaint, the lines "we can't sign not listing" and the "figure something out" are from different emails.  However, Plaintiffs continue to omit the critical context, giving the Court a false sense of the communications between the parties.  The actual email correspondence from the line "we can't sign not listing" to the line "figure something out" is as follows:

> "We can't sign not listing the default. ***Perhaps we can discuss a way to restructure things and sign an amendment quickly. Happy to talk it through***."

> Mr. Tress then responded:

> "I will not acknowledge a default. ***We can revise the lease and remove that or this will not work.*** Sorry. Please let me know asap so i can let bank know if proceeding or closing the project down."[6]

> Tenant then responded:

> "Mark, Confident we can figure something out. Let's all chat together tomorrow afternoon. Let me know your availability and we will reach out then."

(Albert Decl.[7] Ex. A.)

Plaintiffs omitted from both the Complaint and the Amended Complaint Tenant's suggestion that the Lease Parties enter into a Lease amendment and Landlord's understanding of

---

[5] The Amended Complaint was modified to now include the underlined word "subsequently."  However, this addition does not change the fact that Plaintiffs continue to omit from the Court the critical context that Quarters and Landlord were considering a potential Lease *amendment*, not some purported "illegal side letter."

[6] The correspondence also reveals that Mr. Tress was giving Tenant an ultimatum: revise the Lease to remove the default (and all of Tenant's rights under Section 3.5 of the Lease, among others, without any consideration to Tenant) or Landlord will shut down the project.  This context also undermines Plaintiffs' claim that Tenant had previously waived its rights under Section 3.5 of the Lease, as Tenant directly refused to waive its rights when presented with a clear and knowing waiver.

[7] The "Albert Decl." refers to the Declaration of Barbara Albert, dated July 24, 2020.

8

that suggestion.  Instead, Plaintiffs ignore the suggestion in the emails of an amendment to the Lease to help resolve the estoppel certificate issue, and instead, allege that in a follow up phone call Tenant proposed a "side letter" that would have resulted in "bank fraud."  (Amended Complaint ¶ 40.)  This allegation is directly contradicted by the correspondence that Plaintiffs omitted from the Amended Complaint.  Tenant was plainly suggesting (solely to help Landlord) an amendment to the Lease, not a purported "side letter" that would result in false statements to Landlord's lender.  (*See* Albert Decl. Ex. A.)

Plaintiffs also omitted what actually occurred on the phone call with Tenant, including that Landlord expressly told Tenant that it could not provide the rent abatement under the Lease and if Tenant wanted to move forward with its tenancy it needed to fill out a false estoppel certificate that did not acknowledge the default and knowingly waive all its rights under the Lease.  (*Id.* ¶ 4.) Tenant refused to waive its rights.  (*Id.* ¶ 5.)  In response, Landlord told Tenant, "come after me." (*Id.*)  Landlord threatened to shut down the construction site for an indefinite period of time, "maybe a month, maybe a year," and the Tenant could "come after him" whenever Landlord decided to reopen it.  (*Id.*)

Landlord also omitted from both the Complaint and Amended Complaint that on March 18, 2020, Mark Tress sent an email to Tenant stating, "Due to corona we will be shutting the site for next few months and reassess then."  (*Id.* Ex. A.)

Landlord also failed to advise the Court that Landlord had also reached out to Tenant by phone to see if there was any way that Tenant would be willing to waive its right to the rent abatement under the Lease and sign the incorrect estoppel, so that Landlord could obtain financing to comply with its obligations to complete the construction work on the Premises.  (*Id.* ¶ 7.)

### C. Plaintiffs' Actions After Receiving Tenant's Termination Notice

Once it became clear that Landlord may never deliver the Premises and, if it ever did, would not honor the rent abatements Tenant could elect under Section 3.5 of the Lease, Tenant decided to terminate the Lease.

On April 15, 2020, Tenant exercised its rights under Section 3.5 of the Lease and sent Landlord a notice of termination ("Termination Notice"). (Termination Notice, ECF No. 11-4.) The Termination Notice also demanded that Landlord return the security deposit in the amount of $209,250.00. (*Id.* at 2.)

After receiving the Termination Notice, Mr. Tress began threatening Tenant by phone and email. (Albert Decl. ¶¶ 10-11.) For example, on the evening of April 16, 2020, Mr. Tress sent an email stating that the Termination Notice was "wholly rejected for fraudulent cancellation." (*Id.* Ex. B.) A few minutes later, Mr. Tress sent another email, stating: "Also note, that any attempt to further perpetuate any fraud to the LOC due to this false cancellation will result in criminal charges being filed against your company. I am adding criminal attorneys to this e mail chain." (*Id.* Ex. C.)

That same evening, Mr. Tress called one of Tenant's employees threatening to "go to the press" and destroy Quarters' brand and reputation if Tenant did not withdraw the Termination Notice. (*Id.* ¶ 11.)

On April 22, 2020, Landlord, again demanded that Tenant withdraw the Termination Notice. (ECF No. 11-5.) On May 1, 2020, Tenant reiterated the validity of the Termination Letter and requested again that Landlord return Tenant's Security Deposit, which is in the form of a Letter of Credit, pursuant to Section 8.1 of the Lease. (ECF No. 11-7.)

Late the next business day, May 4, 2020, Mr. Tress' entities filed the Complaint in this action against Defendant, the guarantor, claiming Tenant had tried to commit "bank fraud" and that Plaintiffs were entitled to $8 million in accelerated rent payments. These allegations were

false and were specifically plead to generate media attention and harm Quarters' reputation under the cover of litigation privilege.  Moreover, the initial Complaint was filed only on behalf of Mr. Tress' entities (one of which was not even a party to the Lease) and intentionally omitted the other two landlord parties.

The following day, Defendant received requests from press outlets asking if Quarters wanted to respond to the Plaintiffs' allegations "accus[ing] Quarters of 'soliciting outright bank fraud' and then backing out of its $8M lease at the Brooklyn building as Covid shut down New York City."  (Albert Dec. Ex. D.)  An article was published in The Real Deal on May 6, 2020, highlighting Plaintiffs' fake allegations against Quarters of a "fraudulent conspiracy" and "bank fraud."  (*Id.* ¶ 15.)  That same evening, Tenant received a call from Mr. Tress at a "No Caller ID" number.  (*Id.* ¶ 16.)  Mr. Tress asked Tenant multiple times if Tenant had seen the article in The Real Deal as it was "fresh off the press" and then hung up.  (*Id.*)  Mr. Tress also sent text messages to a former employee of Tenant's a week later with a copy of the Real Deal article, stating "Saw this?"  (*Id.* ¶ 17, Ex. E.)

Additionally, the same day The Real Deal article was published, Landlord made a claim against the Letter of Credit in the full amount, pocketing all of Tenant's $209,250 Security Deposit, even though Landlord had never delivered the Premises, the Lease contained no acceleration of rent provision, and the Rent Commencement Date under the Lease had never commenced. (*Id.* ¶ 18.)

Thereafter, Plaintiffs sat back and did nothing.  Plaintiffs did not ask Defendant's counsel to accept service of process of the Complaint, despite the Defendant being located in Germany. (*Id.* ¶ 19.)  Instead, on May 11, 2020, Plaintiffs attempted to settle the matter, asking Tenant again to revoke the Termination Notice based on the allegations in the Complaint.  (*Id.* ¶ 20.)

As the Real Deal article continued to circulate in the press, on May 15, 2020, the harm that Mr. Tress threatened began to be realized.  Among other things, one of Quarters other landlords terminated a lease on another property, citing The Real Deal article.  (*Id.* ¶ 21.)

On May 22, 2020, Defendant moved to dismiss the Complaint with prejudice. (ECF No. 11.)

On June 2, 2020, Defendant's counsel served a letter on Plaintiffs' counsel pursuant to , Fed. R. Civ. P. 11(c)(2) giving Plaintiffs 21 days to withdraw the Complaint and attaching a copy of the proposed Memorandum of Law for Rule 11 Sanctions in substantively similar form as the one filed herewith.

Rather than oppose the motion to dismiss and in order to avoid sanctions based on the initial Complaint, on June 12, 2020, Plaintiffs filed the Amended Complaint, which did not substantively address the defects in the initial Complaint.  (ECF No. 16.)

On June 18, 2020, Defendant elected to apply its motion to dismiss the initial Complaint to the Amended Complaint pursuant to Section 3(D)(iii) of this Court's Individual Practices in Civil Cases and also provided the Court with a comparison of the two documents.  (ECF No. 17.)

On June 24, 2020, Defendant's counsel served another letter on Plaintiffs' counsel pursuant to Fed. R. Civ. P. 11(c)(2) giving Plaintiffs 21 days to withdraw the Amended Complaint and attaching a copy of the proposed Memorandum of Law for Rule 11 Sanctions in substantively similar form as the one filed herewith.  By letter, dated July 13, 2020, Plaintiffs refused to withdraw their claims.

Defendant now seeks sanctions against Plaintiffs for their conduct in attempting a fraud on this Court and commencing an action with the purpose of harming Defendant's reputation and inducing an ill-gotten settlement.

## ARGUMENT

Rule 11 sanctions are required here for multiple reasons: (1) Plaintiffs intentionally asserted claims that have no legitimate legal basis and are contradicted by the Lease; (2) Plaintiffs not only made false allegations that Quarters engaged in illegal conduct, but also deliberately omitted the necessary context from both the Complaint and now Amended Complaint in order to further this deception; and (3) and filed the Complaint for the sole purpose of harassing Quarters and harming its reputation.

## I.   RULE 11 SANCTIONS ARE WARRANTED AGAINST PLAINTIFFS

### A.  Legal Standard

Rule 11(c) authorizes the Court to impose sanctions against a party who has violated Rule 11(b).   Under Rule 11(b), the party "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

In addition to awarding attorneys' fees incurred for the motion, the Court may also impose sanctions "to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)  This may include "nonmonetary directives; an order to pay a penalty into

court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."

The purpose of Rule 11 is "to deter baseless filings." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393 (1990). "[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness." *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000); *Caisse Nationale de Credit Agricole-CNCA, New York Branch v. Valcorp, Inc.,* 28 F.3d 259, 264 (2d Cir. 1994) ("An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an objective standard of reasonableness it is clear that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands").  Subjective bad-faith is not required. *Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC,* No. 16-cv-1318, 2017 WL 4712639, at *2 (S.D.N.Y. Sept. 28, 2017) (internal quotations and citations omitted).

Consequently, even if a plaintiff did not bring its claims for an improper purpose—which in this case Plaintiffs clearly did—it still would not be immune from Rule 11 sanctions. *See* Fed. R. Civ. P. 11 advisory committee's notes (stating that Rule 11 "eliminate[s] any 'empty-head pure-heart' justification for patently frivolous arguments").  Indeed, if even one of Plaintiffs' claims was frivolous, Plaintiffs would face sanctions whether or not other meritorious claims were also included in its complaint. *See Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 504 (2d Cir. 1989) ("[T]o adopt a standard that would deny sanctions for a significant and obviously meritless claim simply because the rest of the pleading was sound strikes us as contrary to this court's established reading of Rule 11.").

Where, as here, all of Plaintiffs' claims are frivolous and Plaintiffs made up allegations of Defendant's illegal conduct to get press coverage, in order to pressure Defendant's to give up their legal rights under the Lease, sanctions are compelled.

### B. Plaintiffs Refuse to Withdraw Their Frivolous Claims

Sanctions are warranted against Plaintiffs for failure to withdraw their baseless claims.  As explained more fully in Defendant's motion to dismiss, Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and, in the alternative, for promissory estoppel, are all barred by well-established New York law, documentary evidence, and by Plaintiffs' own admissions in the Amended Complaint.

The objective unreasonableness of a litigant's claims as a legal matter strongly supports a conclusion that they were filed for an improper purpose. *See Knipe v. Skinner*, 19 F.3d 72, 77 (2d Cir. 1994) (holding that the lack of merit to the action supported the record that the plaintiff was "pursuing a personal agenda against the [defendants]"); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 661 (S.D.N.Y. 1996) (holding that legal baselessness of claims supported inference that action was "filed for improper purposes").  Indeed, if even one of Plaintiffs' claims was frivolous, Plaintiffs would face sanctions whether or not other meritorious claims were also included in its complaint. *See Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 504 (2d Cir. 1989) ("[T]o adopt a standard that would deny sanctions for a significant and obviously meritless claim simply because the rest of the pleading was sound strikes us as contrary to this court's established reading of Rule 11.").

Where, as here, all of Plaintiffs' claims against Defendant are frivolous, sanctions are compelled.

First, Plaintiffs' claim for $8 million in damages for accelerated rent payments is barred by more than a century of New York law.  (Amended Complaint ¶¶ 1, 46, 48, 51.)  New York law is

clear: "no suit can be brought for future rent in the absence of a clause permitting acceleration." *Maflo Holding Corp. v. S.J. Blume, Inc.*, 308 N.Y. 570, 575 (N.Y. 1955) (citing *McCready v. Lindenborn*, 172 N.Y. 400 (N.Y. 1902)).  The Lease here contains *no acceleration clause*.  Indeed, Section 19.3 of the Lease provides the opposite, that Landlord can only recover rent "*as [it] become[s] due under this Lease*."  (Lease § 19.3, ECF No. 11-1) (emphasis added.)  Moreover, Landlord is not currently entitled to any rent under the Lease because Landlord admittedly never delivered the Premises and the Rent Commencement Date under the Lease never began.  Nor did Plaintiffs make any effort to allege that any rent is now due and owing, as it is not.  The only reason for Plaintiffs to include the $8 million demand was to get the attention of the press, which they did.

Further, the Amended Complaint is barred by the Lease and Guaranty, which Plaintiffs had a duty to review before filing either their Complaint or Amended Complaint, and to accurately recite the relevant provisions to the Court in order to support their claims.  Both versions of the complaint demonstrate that Plaintiffs did review (at least) the Lease, but deliberately chose not to provide the Court with a copy of the Lease or to recite the relevant provisions of the Lease because the Lease undermines Plaintiffs' claims.  Further, to the extent Plaintiffs did not have a copy of the Lease to review before commencing this action (which is unlikely), Defendant attached a copy of the Lease to its motion to dismiss the initial Complaint.  (ECF No. 11-1.)  Therefore, at the very least, Plaintiffs were obligated to review the relevant provisions of the Lease and properly cite them to the Court in the Amended Complaint, which Plaintiffs again failed to do.

As one example of many, Plaintiffs' allegations acknowledge that the Lease contains a damages mitigation provision, which would bar Plaintiffs' demand for $8 million in accelerated rent.  (Amended Complaint ¶ 46, Lease § 19.3.)  Yet, in an attempt to circumvent this provision of

the Lease, Plaintiffs make the farcical contention that Landlord cannot mitigate its damages *in the next 10 years* due to the current pandemic and emergency orders.  (*Id.* ¶¶ 46, 48.)  As we all know, the emergency orders are already beginning to be modified, and Landlord will certainly have the opportunity to show the Premises to other tenants in the next ten years.  Landlord could also show the Premises now, virtually.  In making the Complaint, and now Amended Complaint, however, Plaintiffs were not concerned with fact and reality – they were seeking press coverage and to harm Quarters' reputation.

Additionally, Plaintiffs specifically allege that "Section 21.1 of the Lease unconditionally required Tenant to provide [an estoppel] certificate at Cedar's request."  (Amended Complaint ¶ 32.)  While Plaintiffs correctly identified the correct provision of the Lease relating to estoppel certificates, there is nothing "unconditional" about Tenant's obligations in Section 21.1, and Plaintiffs fail to actually cite the provision or attach a copy of the Lease for the Court to evaluate. In fact, Section 21.1 is not unconditional with respect to Landlord's defaults under the Lease, which is the relevant provision for purposes of the Amended Complaint.  Rather, the Lease provides that "if Tenant has such knowledge [of Landlord's uncured defaults], [Tenant may] specify[] them in detail" prior to executing the estoppel certificate.  (Lease § 21.1.) This is precisely what Tenant did and what Plaintiffs allege that Tenant did.  The reason Plaintiffs omitted the Lease and the terms of Section 21.1 could only have been to mislead the Court.

Unfortunately, this is only a sampling of Plaintiffs' attempts to misdirect the Court and create a complaint designed for press coverage, not for the enforcement of Plaintiffs' legal rights. It is evident from Plaintiffs' baseless and deficient Complaint (and which defects continue in the Amended Complaint) and as more fully outlined in Defendant's motion to dismiss the Complaint with prejudice, that Plaintiffs knowingly and intentionally asserted claims and allegations in this

action that they knew were false and barred by controlling law.  Yet, Plaintiffs filed this action

regardless so as to carry out the plan Mr. Tress previously threatened: use the Complaint to garner

media attention designed to damage Quarters' reputation and brand so as to punish Quarters for

exercising its contractual rights.  Such conduct should be met with appropriate sanctions.

### C.  Sanctions Are Warranted Because Plaintiffs Deliberately Made False Allegations in the Complaint

In addition to the fact that the Amended Complaint has no legal or factual support,

sanctions are warranted against Plaintiffs because they crafted both the Complaint and Amended

Complaint to omit certain details of communications between the Lease Parties *for the purpose of*

*making false allegations of bank fraud*.  Mr. Tress promised to go to the press and destroy Quarters'

reputation, and he used this Court to further that agenda.  This is a plain abuse of the judicial

process that deserves sanctions.

In Paragraphs 32-40 of the Amended Complaint, Plaintiffs allege that Landlord asked

Tenant to execute an estoppel certificate, so that Landlord could obtain financing to complete

construction work on the Premises.  Landlord also alleges that Tenant refused to execute the

estoppel certificate due to Landlord's default in failing to deliver the Premises, but purportedly

suggested in a phone call that Tenant could sign a false estoppel certificate "**if** Cedar would sign a

'side letter' stating the opposite."  (Amended Complaint ¶ 40.)

Leading up to this "bank fraud" bombshell, Plaintiffs allege that the parties corresponded

via email about this issue and that this correspondence is set forth in Paragraph 39 of the Amended

Complaint.  However, Plaintiffs *deliberately omitted* the relevant portions of the correspondence

they rely on, because those portions contradict Landlord's fake allegation of "bank fraud."

Specifically, Plaintiffs omitted Tenant's email suggestion to "discuss a way to restructure things

and sign an amendment quickly."  (Albert Decl. Ex. A.)  Plaintiffs also omitted Mr. Tress' own

response acknowledging the suggestion to "revise the lease and remove [the default] or this will not work." [89]  (*Id.*)

The actual correspondence reveals that the Lease Parties were discussing an *amendment to the Lease*.  Not some "illegal" side letter.  Not to make false representations to the lender.  Plaintiffs knew this, and they deliberately cherry-picked from the communications so that they could allege illegal activity to the Court, attract media attention, and damage Quarters' reputation.  Plaintiffs also failed to cure this deliberate omission in the Amended Complaint, despite being served with a Rule 11 safe harbor letter and accompanying memorandum of law on June 2, 2020, which directly addressed this issue in substantially the same form as this motion does now.

This is a clear abuse of the legal process that is deserving of sanctions. *See e.g., Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) (affirming award of sanctions for the filing of frivolous claims that were "clearly an attempt to intimidate the defendant into a large settlement ... which ... was an improper purpose under Rule 11(b)(1)"); *Baasch v. Reyer*, 827 F. Supp. 940, 944 (E.D.N.Y. 1993) (imposing sanctions on a pro se litigant who filed a frivolous motion "for the sole purpose of harassing defendants and needlessly increasing the costs of this litigation"); *United States v. Int'l Bhd. Of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) (holding that under its inherent power a court may sanction a party that "acted in bad faith, vexatiously, wantonly, or for oppressive reasons").

---

[8] The correspondence also reveals that Mr. Tress was giving Tenant an ultimatum: revise the Lease to remove the default (and all of Tenant's rights under Section 3.5 of the Lease, among others, without any consideration to Tenant) or Landlord will shut down the project.  This context also undermines Plaintiffs' claim that Tenant had previously waived its rights under Section 3.5 of the Lease, as Tenant directly refused to waive its rights when presented with a clear and knowing waiver.

[9] Plaintiffs also omitted what occurred during the March 18, 2020 phone conversation, namely that Landlord would not agree to acknowledge the default, could not honor the rent abatement required under the Lease, and Landlord's threat that if Tenant wanted to move forward with its tenancy, Tenant would be required to complete the estoppel without acknowledging the default and waiving all of Tenant's rights.  (*See* Albert Decl. ¶¶ 4-5.)

**D.  Sanctions Are Warranted Because Plaintiffs Filed the Complaint and Amended Complaint for Improper Purposes**

There can be no doubt that Plaintiffs' reasons for filing the Complaint (and Amended Complaint) are sanctionable.  Plaintiffs used the judicial process to pursue factually and legally meritless claims in order to garner media attention, besmirch Quarters' reputation, and try to strong-arm Tenant into withdrawing its Termination Notice.

From the moment Landlord received the Termination Notice, Mr. Tress began threatening retaliation against Tenant and Quarters.  First, Mr. Tress threatened to go to the media in order to ruin Quarter's brand and reputation because Tenant's refused to withdraw its Termination Notice. (Albert Decl. ¶ 11.)  Then Mr. Tress threatened criminal prosecution for "false cancellation."  (*Id.* Exs. B-C.)  When that did not work, Landlord sent a letter through counsel demanding withdrawal of the Termination Notice.  (ECF No. 11-5, 11-6.) That, too, was rejected.  (ECF No. 11-7.) Recognizing Tenant would not be swayed by Landlord's threats, Plaintiffs filed the Complaint to use the cover of litigation privilege to smear Quarters' reputation in the press and pocket more than $200,000 of Tenant's security deposit.

Plaintiffs were well aware that allegations related to terminating a 10-year lease valued at $8,000,000 and bank fraud would garner press attention and besmirch Quarter's reputation among other landlords.  And it did.  In fact, the press coverage of Plaintiffs' allegations have caused the landlord of another project in a completely different state to doubt Quarter's ability to carry out its financial obligations as tenant under a different lease.  (Albert Decl. ¶ 21.)

Additionally, Plaintiffs improper purpose in commencing this action was quickly confirmed by Plaintiffs' conduct after filing the Complaint, including (1) calling Tenant from an unknown number to gloat about The Real Deal article covering Plaintiffs' fake "bank fraud" allegations, *id.* ¶ 16; (2) sending text messages to Tenant's former employees with a link to The

Real Deal article, *id.* ¶ 17, Ex. E; (3) drawing down on Tenant's letter of credit where no rent had ever become due and owing under the Lease, *id.*¶ 18; and (4) asking Defendant to withdraw its Termination Notice now that it had seen the Complaint, without ever asking Defendant to accept service of process of the Complaint or joining 2/3 of the landlord parties to the Lease, *id.* ¶¶ 19-20.

Then, in the face of a threatened motion to sanctions, Plaintiffs doubled down on their strategy in the Amended Complaint.  As explained herein, the Amended Complaint failed to address the substantive defects with the initial Complaint, because it cannot.  Rather, much of the new text of the Amended Complaint is dedicated to further maligning Quarters' reputation by citing Yelp.com reviews on other Quarters-branded locations in Chicago and New York. (Amended Complaint ¶ 25.)  There is no purpose for citing these Yelp.com reviews, other than to further besmirch Quarters' reputation, as these individual complaints have nothing to do with this Lease or the Plaintiffs' claims.  Indeed, it is telling that the only block quotes in the Amended Complaint are from unsatisfied, unverified Yelp.com reviews, but the Amended Complaint does not quote a single provision of the Lease under which Plaintiffs purport to be entitled to $8 million in accelerated rent payments.  This action and Plaintiffs continued pursuit of it, in spite of two Rule 11 safe harbor letters, is a farce designed to harass Quarters and is deserving of sanctions.

For these reasons, Plaintiffs should be sanctioned. *See Bello v. Barden Corp.*, 2006 WL 2827091, at *10 (D. Conn. Sept. 29, 2006) (sanctions for pursuing action "as part of a course of conduct calculated to harass defendants . . . into settlement for the nuisance value of the litigation"), *aff'd in part sub nom. Umeugo v. Barden Corp.*, 307 F. App'x 514 (2d Cir. 2009); *see also Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *14 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (sanctions  for claims "not only . . . frivolous, [but

clearly] intended at least in part to harass [defendant] . . . and possibly also intended to extort a settlement").

## II.    MONETARY SANCTIONS ARE WARRANTED

Under Rule 11, this Court "has available a variety of possible sanctions to impose for violations," and "[w]hether a violation has occurred and what sanctions, if any, to impose for a violation are matters committed to the discretion of the trial court." *See* Fed. R. Civ. P. 11 advisory committee's notes (1993). Where "deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation," attorneys' fees may be awarded to the other party. *See, e.g, Caisse Nationale,* 28 F.3d at 266 (awarding double attorneys' fees incurred by movant after the date on which the offending party filed pleadings containing baseless assertions of fact and law in violation of Rule 11).

In examining whether to impose sanctions, Courts may consider the following factors:

> (1) Whether the improper conduct was willful, or negligent; (2) whether it was part of pattern or activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case.

*Bonded Life Fund, LLC v. AXA Equitable Life Ins. Co.,* No. 13-cv-5451, 2014 WL 930059, at *4 (S.D.N.Y. Feb. 28, 2014) (citations omitted).

Plaintiffs' improper conduct here was intentional and "infect[s] the entire pleading," as the entire action is based on Plaintiffs' frivolous claims, impossible legal theories, and falsehoods, all of which Plaintiffs have stubbornly maintained despite having been served with two Rule 11 safe

harbor letters.  As a result, Defendant expended considerable time and resources defending itself, including making a motion to dismiss, preparing two motions for sanctions and Rule 11 safe harbor letters, and responding to Landlord's attempts to harm its reputation.  This Court has "similarly been required to expend unnecessary time and resources dealing with this action." *Id.*

Further, Plaintiffs' improper conduct in misleading the Court regarding the Lease Parties' actual communications related to the estoppel certificate, Landlord drawing down the Letter of Credit thereby failing to return Tenant's security deposit, in direct violation of the Lease, and Landlord's threats after Tenant terminated the Lease also supports an award of Rule 11 sanctions.

In this case, Defendant respectfully submits that this Court should impose on Plaintiffs, the full extent of Rule 11 sanctions. Because Plaintiffs' improper pleading has caused Defendant to incur substantial legal fees, Defendant respectfully requests that those sanctions include the reasonable expenses and attorneys' fees it has incurred in bringing this motion as well as the Motion to Dismiss, directing Plaintiffs to return Tenant's security deposit with interest, and bar Plaintiffs' claims by dismissing them with prejudice.  Such sanctions are appropriate "to deter repetition of such conduct or comparable conduct by others similarly situated."  *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 131; *see* Fed. R. Civ. P. 11(c)(2), (4).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court grant Defendant's motion for Rule 11 Sanctions against Plaintiffs, awarding Defendant its costs and attorneys' fees incurred in defending this action and bringing this motion, directing Plaintiffs to return Tenant's security deposit with interests, barring Plaintiffs' claims by dismissing them with prejudice, and for such other and further relief as this Court deems just.

New York, New York
Dated: July 27, 2020

Respectfully submitted,

By: */s/ Joshua D. Bernstein*
    Joshua D. Bernstein
    Kathleen M. Prystowsky
    Ruma B. Mazumdar
AKERMAN LLP
520 Madison Avenue, 20th Floor
New York, NY, 10022
Tel.: (212) 880-3856
Fax: (212) 905-6410
Email: Joshua.Bernstein@akerman.com

*Counsel for Defendant Quarters Holding GmbH*