**IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

| | |
|---|---|
| **JM HOLDINGS 1 LLC AND** | ) |
| **CEDAR HOLDINGS, LLC** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **QUARTERS HOLDING GmbH** | ) |
| | ) |
| **Defendant.** | ) |

**Civil Action No. 1:20-cv-03480-JPO**

---------------------------------------------------------

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR THE IMPOSITION
OF SANCTIONS PURSUANT TO RULE 11**

Nathaniel J. Kritzer
Michael G. Scavelli
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, New York 10036

*Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

COUNTERSTATEMENT OF RELEVANT FACTS .................................................... 3

I.     The Lease & Guaranty ........................................................................................ 3

II.    Defendant's Failure to Deliver an Estoppel Certificate as Required by the Lease ................ 5

III.   Pre-Litigation Communications Between the Parties ............................................. 7

ARGUMENT ..................................................................................................................... 7

I.     Applicable Legal Standards ................................................................................. 7

II.    Plaintiffs' Claims Are Meritorious and Supported by Binding Precedent ............................. 9

III.   The Allegations in the Complaint Are True and Supported by Evidence ............................ 15

IV.    Defendant's Allegations of an "Improper Purpose" are Wrong and Cannot Support a Motion for Sanctions ................................................................................................ 16

V.     Defendant's Refusal to Provide Full Discovery Precludes Its Motion for Sanctions ........... 20

VI.    Defendant is Not Entitled to Any of the Sanctions It Seeks ................................................. 21

VII.   Plaintiffs Are Entitled to Costs for Defendant's Frivolous Motion ....................................... 22

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Am. List Corp. v. U.S. News & World Report, Inc.*,
 75 N.Y.2d 38 (1989) ...................................................................................10

*Baasch v. Reyer*,
 827 F. Supp. 940 (E.D.N.Y. 1993) ...........................................................18, 19

*Barash v. Pennsylvania Term. Real Estate Corp.*,
 26 N.Y.2d 77 (1970) ...................................................................................12

*Bello v. Barden Corp.*,
 No. 3:01CV01531(AWT), 2006 WL 2827091 (D. Conn. Sept. 29, 2006)...........19

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
 No. 16-CV-885 (JPO), 2019 WL 422613 (S.D.N.Y. Feb. 4, 2019) ........7, 8, 18, 22

*Colliton v. Cravath, Swaine & Moore LLP*,
 No. 08 CIV 0400 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008)..............19

*E. Gluck Corp. v. Rothenhaus*,
 252 F.R.D. 175 (S.D.N.Y. 2008) ..................................................................7

*Indep. Asset Mgmt. LLC v. Zanger*,
 538 F. Supp. 2d 704 (S.D.N.Y. 2008)...........................................................10

*Koar v. United States*,
 No. 96 Civ. 5166, 1997 WL 1038181 (S.D.N.Y. Sept. 2, 1997)...........................9

*Long Island R. Co. v. Northville Indus. Corp.*,
 41 N.Y.2d 455 (1977) ...................................................................................11

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
 2006 WL 2807213 (S.D.N.Y. Sept. 28, 2006)..................................................7

*Maflo Holding Corp. v S. J. Blume, Inc.*,
 308 NY 570 (1977) .......................................................................................11

*Morley v. Ciba-Geigy Corp.*,
 66 F.3d 21 (2d Cir. 1995) ..............................................................................18

*Oswell v. Morgan Stanley Dean Witter & Co.*,
 507 F. Supp. 2d 484 (D.N.J. 2007) ................................................................10

*Pannonia Farms, Inc. v. USA Cable*,
  426 F.3d 650 (2d Cir. 2005).................................................................................8

*Pitcher v. Benderson-Wainberg Assocs. II, Ltd. P'ship*,
  277 A.D.2d 586 (App. Div. 3d Dep't 2000) ........................................................11

*Revson v. Cinque & Cinque, P.C.*,
  221 F.3d 71 (2d Cir. 2000).................................................................................17

*Safe-Strap Co. v. Koala Corp.*,
  270 F. Supp. 2d 407 (S.D.N.Y. 2003)............................................................16, 22

*Storey v. Cello Holdings, L.L.C.*,
  347 F.3d 370 (2d Cir. 2003)...........................................................................8, 16

*Sussman v. Bank of Israel*,
  56 F.3d 450 (2d Cir. 1995).................................................................................17

*Tirse v. Andrews*,
  128 A.D.3d 1112 (App. Div. 3d Dep't 2015) .......................................................12

*United States v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen &
  Helpers of Am., AFL-CIO*,
  948 F.2d 1338 (2d Cir. 1991)..............................................................................19

*W.K. Webster & Co. v. Am. President Lines, Ltd.*,
  32 F.3d 665 (2d Cir. 1994).................................................................................21

*ZCWK Assocs., L.P. v. Spadaro*,
  233 A.D.2d 126 (App. Div. 1st Dep't 1996) ......................................................12

**Rules**

Fed. R. Civ. P. 11 ................................................................................ passim

## INTRODUCTION

This case asserts straightforward claims based on a tenant's wrongful repudiation of a valuable, long-term lease. As alleged in the Amended Complaint and explained in Plaintiffs' opposition to Defendant's motion to dismiss, after entering into a binding contract and inducing Plaintiffs to spend millions of dollars on custom modifications for a highly specific use, Defendant abruptly abandoned the project and repudiated its ten-year commercial lease agreement when COVID-19 began spreading rapidly in New York. That repudiation caused significant damages in the form of, *e.g.*, wasted expenses, lost income, and loss of value for the relevant property. Plaintiffs have asserted valid claims based on these facts.

Defendant responded to these claims with a meritless motion to dismiss, which Plaintiffs accurately and fully rebutted in their opposition papers. Not content to file just one baseless motion, Defendant then piled on quickly with a patently meritless Rule 11 motion. In its latest poorly aimed salvo, Defendant makes flatly incorrect, sweeping pronouncements that the claims underlying "the entire action" are "frivolous," "impossible," and "barred by the Lease and Guaranty." Br.[1] at 22. Defendant doesn't even try to back these claims up. Instead, it offers three supposed "examples," none of which comes remotely close to showing sanctions are warranted.

Two of the three "examples," by Defendant's own admission, challenge only the measure of damages for Plaintiffs' breach of contract claim. Defendant's argument ignores that Plaintiffs have cited ***binding authority*** in support of their claim for anticipatory repudiation, authority that Defendant has utterly failed to distinguish. By making a superficial and premature declaration of "victory" on this point through a meritless Rule 11 motion, Defendant hopes it will stick. As explained below, it should not.

---

[1] Defendant's Brief in Support of its Motion for the Imposition of Sanctions Pursuant to Rule 11 (ECF No. 27).

Defendant also ignores the broad scope of damage claims asserted by Plaintiffs and the fact that significant proceedings (including fact discovery) stand between this moment and any damages award. As such, and as Plaintiffs amply explained in their opposition to Defendant's motion to dismiss, this is not the proper stage of the case for calculating damages. All that is required now is a plausible allegation of damages, a hurdle that Plaintiffs' straightforward damages claims clear by a country mile. Nothing about these damage claims comes close to warranting sanctions.

Next, Defendant accuses Plaintiffs of making "false allegations." In fact, Defendant only claims one—that Quarters proposed entering into a side letter that stated the exact opposite of what they would be telling Plaintiffs' lender. And Defendant *has not once actually denied it made just such a proposal*. Incredibly, Defendant even submitted a declaration from one of its employees who attended the relevant call, who says *nothing* about the side letter offer. *See generally* Decl. of Barbara Albert, ECF No. 26 ("Albert Decl."). By contrast, Plaintiffs have filed a declaration of Cedar's principal, Mark Tress, which states in no uncertain terms that Quarters *did* make this proposal. In short, Defendant seeks sanctions for the purported "falsity" of a factual statement that all evidence shows was true. That argument is beyond meritless; it is frivolous.

Finally, Defendant argues that alleged threats of litigation from Mr. Tress and others somehow warrant sanctions because their sole purpose was supposedly to intimidate and strong-arm a large, multi-national company in the context of an arm's-length business relationship. That argument is false and facially implausible. The reason for this lawsuit is self-evident: recovery of the damages Defendant caused to Plaintiffs. Defendant actively encouraged Plaintiffs to pour large sums of time and money into the Brooklyn Property (or "Premises") and then, after

COVID-19 began spreading rapidly, came up with a bogus theory that Plaintiffs had defaulted, abandoned the project, and left Plaintiffs holding the bag. Unsurprisingly, the Second Circuit has held that there is absolutely nothing wrong with threatening a lawsuit to resolve a business dispute like this one.

In sum, Defendant does not even come close to backing up the reckless invective it launches against Plaintiffs and its counsel throughout its brief. Plaintiffs have properly pled claims against the Defendant and this case should proceed on the merits. The motion should be denied.

<u>**COUNTERSTATEMENT OF RELEVANT FACTS**</u>

The Amended Complaint and Plaintiffs' Opposition to Defendant's Motion to Dismiss ("MTD Opposition" or "MTD Opp.") sets forth a thorough recitation of the relevant facts. Plaintiffs will not burden the Court with a duplicative recitation, but Plaintiffs note below certain additional facts and inaccuracies contained in the Relevant Facts section in Defendant's brief.

**I.      The Lease & Guaranty**

In describing the Lease, Defendant continues to advance as a "fact," its erroneous argument that the failure to deliver the Premises by the Outside Delivery Date was a "default" under the Lease. This misapprehension permeates its Rule 11 motion.

As pleaded in the Amended Complaint and explained in the MTD Opposition, the Lease had no representation, warranty, or covenant that the renovations would be completed by November 30, 2019. MTD Opp. at 15. In fact, the Lease specifically contemplates scenarios where the Premises are not delivered by the "Outside Delivery Date." There can be no genuine dispute about this. And in accusing Plaintiffs of misstating the Lease, Defendant does just that.

Defendant suggests that the relevant representation, warranty, or covenant is contained in Section 3.1 of the Lease. Br. at 7. But, this provision simply does not say that the Premises must be completed by November 30. Instead, Section 3.1 says in its entirety:

> Landlord, at Landlord's sole cost and expense, shall complete the renovation of the Building in accordance with Exhibit C attached hereto ("Landlord's Work"), in order that the completion of Landlord's Work shall provide a "turn-key" build-out of the Premises for Tenant as of the Delivery Date, with the Premises ready for use and occupancy for the Initial Permitted Use by Tenant, Tenant's Customers, and their respective guests, licensees and invitees.

The Delivery Date is defined in the very next section as the date on which a number of "Delivery Conditions" were satisfied. *See* Lease § 3.2. It does not mention a date certain at all—only noting that the Delivery Date cannot occur before the Anticipated Delivery Date. *Id.* Section 3.3, in turn, notes that "[a]s of the Effective Date, the Delivery Date is ***currently anticipated*** to occur ***on or about*** one hundred twenty (120) days after the Effective Date" (*i.e.*, November 3, 2019) and refers to this date as the "Anticipated Delivery Date." Section 3.3 also requires the Landlord to give Tenant notice 30 days in advance of when it "***anticipates the Delivery Date to occur***." Section 3.5 then provides:

> ***If the Delivery Date has not occurred on or before November 30, 2019*** (the "Outside Delivery Date"), then Tenant, in its sole discretion, may elect one of the following additional rights: (i) give Landlord a written notice of termination of this Lease . . . ; or (ii) receive one (1) day of Base Rent and Additional Rent abatement (in an amount equal to the applicable Rent rate for periods following any Rent abatement) for each day of delay that the actual ***Delivery Date extends beyond the Outside Delivery Date***.

Lease § 3.5 (emphasis added).

These provisions make clear that, as Plaintiffs pleaded, no representation, warranty, or covenant in the Lease required delivery by the Anticipated Delivery Date (November 3, 2019) or the Outside Delivery Date (November 30, 2019). The "Delivery Date" is defined as the date on

4

which certain of the Landlord's work on the Premises **has been performed**, not a specific date by which obligations **must be** performed. Defendant seeks to conflate these terms to write a nonexistent covenant into the Lease.

Finally, Defendant argues that Section 3.1 must be a representation, warranty, or convent to deliver by November 30, 2019, because Article 3 of the Lease is captioned "Landlord's Representations and Warranties and Covenants; Delivery of Premises." The Lease itself rejects that argument. Section 25.10 of the Lease makes clear that captions, like the one Defendant relies on, "are for convenience only and **shall not affect the interpretation of the provisions hereof**."

## II.  Defendant's Failure to Deliver an Estoppel Certificate as Required by the Lease

As described in the Amended Complaint, four months passed from the Outside Delivery Date, and Defendant did not even whisper the word "default" (or "termination" for that matter). To the contrary, Defendant actively encouraged Plaintiffs to continue investing time and resources into the project throughout that time period.

It was only in March 2019, as the COVID-19 pandemic reached New York City, that Defendant mentioned a supposed default for the first time. Tellingly, Defendant did not provide written notice of that supposed default and the opportunity to cure, as would be required by Section 16.1 Lease.[2] Instead, Defendant insisted that an uncured default be referenced in an estoppel certificate that the Lease required Defendant to provide. Kritzer Decl.[3] Ex. A at Quarters 000089.

Mr. Tress communicated that he would not acknowledge a default on the estoppel certificate (because Cedar had not defaulted). *Id.* In a phone call, Quarters then proposed

---

[2] In fact, Defendant has *never* actually noticed a default to Plaintiffs under the Lease. Even the termination notice that they would later send to Plaintiffs said nothing of a default.

[3] Declaration of Nathaniel J. Kritzer, filed contemporaneously herewith.

executing a side letter, which would acknowledge purported defaults while issuing an estoppel for delivery to the lender stating the opposite. Tress Decl.[4] ¶ 4. Mr. Tress immediately rejected that proposal as soliciting outright bank fraud. *Id.*

In arguing these allegations are false, Defendant primarily claims that because an earlier email chain it cites does not contain the solicitation of fraud alleged in the complaint (and instead repeatedly requests a phone conversation), Quarters could not ***possibly*** have proposed that conduct in the subsequent phone call. Br. 7-9. The flaw in that reasoning is obvious: a party can say one thing in an email and another in a phone conversation. And there is, in fact, uncontested evidence that the Amended Complaint's allegations regarding that call are entirely correct. Tress Decl. ¶ 4.

The evidence gets worse for Defendant the closer one looks. To ensure a full record in opposition to the Rule 11 motion, Plaintiffs sought discovery from Defendant shortly after the Rule 11 motion was filed. In particular, Plaintiffs asked for all documents relating to certain conversations referenced in the declaration submitted by Defendant's witness. *See* Kritzer Decl. Ex. B at 13-14; ECF No. 29-1. In response to that request, Quarters produced, among other documents, an email from Jaryd Lindheim of Quarters to his business colleagues Bobby Condon, Philip Grace, and Rui Barros, copying Quarters' in-house counsel, Lori Albert (the "Lindheim Email"). *See* Kritzer Decl. Ex. C.

Even in heavily redacted form,[5] the Lindheim Email directly contradicts Defendant's argument in its Rule 11 motion. *See* Br. at 8-9. Specifically, the Lindheim Email states explicitly that, in the March 19 phone call, Quarters "drew a line in the sand" by suggesting the parties use

---

[4] Declaration of Mark Tress, filed contemporaneously herewith.

[5] Plaintiffs have separately sought *in camera* review and production of an unredacted copy of this email and reserve the right to supplement the record. ECF No. 28.

a **separate** document (instead of the estoppel, which would be given to the bank) to "acknowledge" supposed defaults. Kritzer Decl. Ex. C. Mr. Tress rejected that proposal. Tress Decl. ¶ 4. These are the same facts Plaintiffs alleged, and which Defendant incorrectly argues warrant sanctions. *See* Am. Compl. ¶ 40 ("Quarters suggested that it could issue an estoppel certificate stating there were no uncured defaults under the Lease, which Cedar could then present to its bank to get funding, if Cedar would sign a 'side letter' stating the opposite.").

## III.    Pre-Litigation Communications Between the Parties

A repeated—and false—refrain from Defendant is that Plaintiffs "leaked" the filing of this case to The Real Deal ("TRD"). *E.g.*, Br. at 1. Whatever that statement could mean regarding a publicly filed complaint, it is simply incorrect. *See* Tress Decl. ¶ 5. TRD, like other media outlets, is perfectly capable of searching public filings and publishing on whichever ones it chooses. That is exactly what happened here. *See id* ¶¶ 5-6.

The First Amendment of the United States Constitution protects the freedom of the press to report on court proceedings such as this one. There was simply nothing improper about TRD's decision to report accurately on this case. That reporting does not warrant sanctions against anyone, much less Plaintiffs, who simply filed a lawsuit that caught a reporter's eye.

## <u>ARGUMENT</u>

## I.    Applicable Legal Standards

Sanctions are an "extreme measure" reserved for only the most extraordinary circumstances. *See e.g., Bobcar Media, LLC v. Aardvark Event Logistics, Inc.,* No. 16-CV-885 (JPO), 2019 WL 422613, at *5 (S.D.N.Y. Feb. 4, 2019); *E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 178 (S.D.N.Y. 2008); *Louis Vuitton Malletier v. Dooney & Bourke, Inc*., 2006 WL 2807213, *6 (S.D.N.Y. Sept. 28, 2006) (observing that "[s]anctions should always be a (very) last resort" and noting, in particular, that the court was "not persuaded at this early [motion to

dismiss] stage of the proceedings" ). "'[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness' and is not based on the subjective beliefs of the person making the statement." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003) (quoting *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000)); *see also Bobcar Media, LLC,* 2019 WL 422613 at *2.

To establish a Rule 11(b)(2) violation, it must be "patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands." *E. Gluck Corp*, 252 F.R.D. at 178; *Bobcar Media, LLC,* 2019 WL 422613 at *3. "[T]he extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys" is relevant to deciding a Rule 11 motion. Fed. R. Civ. P. 11 advisory committee note to 1993 amendments. To establish a Rule 11(b)(3) violation, a factual contention must be utterly lacking in any factual support.  *Storey*, 347 F.3d at 388.

Courts maintain a high bar for establishing a Rule 11 violation given judicial concern for encouraging full advocacy of a parties' position, and concern for abuse of the rule. As the Second Circuit has expressly cautioned:

> Rule 11 sanctions are a coercive mechanism, available to trial court judges, to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy. Although the imposition of sanctions is within the province of the district court, "any such decision [should be] made with restraint and discretion."

*Pannonia Farms, Inc. v. USA Cable*, 426 F.3d 650, 652 (2d Cir. 2005) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999)).

In cases where the movant's Rule 11 motion is denied, a court may issue sanctions against the movant because "the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions." Fed. R. Civ. P. 11 advisory committee note to 1993 amendments. *See also Koar v. United States*, No. 96 Civ. 5166, 1997 WL 1038181, at *2 n.2 (S.D.N.Y. Sept. 2, 1997) (Bernikow, M.J.) ("[T]he making of a frivolous Rule 11 motion can itself result in sanctions against the movant."). The nonmoving party need not file a cross-motion to receive fees, as the court can award reasonable expenses to the prevailing party, including attorney's fees, incurred in presenting or opposing the motion. *See* Fed. R. Civ. P. 11 advisory committee note to 1993 amendments ("[S]ervice of a cross motion under Rule 11 should rarely be needed since under the revision the court may award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion"); Fed R. Civ. P 11(c)(2) ("If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion").

## II.    Plaintiffs' Claims Are Meritorious and Supported by Binding Precedent

Defendant relies heavily on a false and sweeping contention that "***all*** of Plaintiffs' claims against Defendant are frivolous." Br. at 15. But Defendant does not come close to showing this. In contrast to the sweeping scope of its rhetoric, Defendant limits argument to three purported "examples" from the Amended Complaint, two of which concern calculation of damages (an issue that is not even before the Court at this stage). None of these "examples" comes close to validating Defendant's conclusory argument that "all" of Plaintiffs' claims are "frivolous."

*First*, Defendant sets up a straw man by arguing that Plaintiffs are seeking "future rent" as damages, then immediately attacks its own "future rent" theory (which is found nowhere in the Amended Complaint). Br. at 15. As an initial matter, Defendant ignores that Plaintiffs are

simply asserting a claim for the benefit of their bargain under the Lease under a total breach theory, ***not*** a claim for all future rent due to a tenant falling behind on rent, the fact pattern in the cases Defendant relies on to frame its argument. And Defendant ignores that this is just one of several damages theories that Plaintiffs assert, which also include, for example, loss of value and lost expenditures (*see* MTD Opp. at 14). The precise measure of damages does not need to be— and should not be—determined now, before discovery has gone forward and before submission of any expert analysis on damages. All that is required at this early stage is a "plausible allegation of damages." *Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008); MTD Opp. at 14. The Amended Complaint satisfies that requirement in spades. *Compare* MTD Opp. at 14 *with* MTD Reply at 3-5 (failing to rebut Plaintiffs' arguments). *See also Oswell v. Morgan Stanley Dean Witter & Co.*, 507 F. Supp. 2d 484, 489 n.3 (D.N.J. 2007) ("A Rule 11 motion is seldom the proper crucible for adjudicating underlying claims that have not been subjected to dispositive motion practice or trial.").

Even putting aside, *arguendo*, the light pleading burden at this stage, Plaintiffs have offered unrebutted, applicable legal authority supporting a claim for total breach under the anticipatory repudiation doctrine. MTD Opp. at 13 n.6. Indeed, Defendant's Reply in Further Support of its Motion to Dismiss ("MTD Reply") spends several ***pages*** trying (unsuccessfully) to distinguish this authority. *See* MTD Reply at 3-5. Defendant's arguments in its brief and in the MTD Reply are wrong and cannot form the basis for sanctions.

It is a bedrock principle of New York law that "a wrongful repudiation of the contract by one party before the time for performance entitles the non-repudiating party to immediately claim damages for a total breach." *Am. List Corp. v. U.S. News & World Report, Inc*., 75 N.Y.2d 38, 44 (1989). Defendant's suggestion that New York law *per se* does not allow claims for

"future rent" under an anticipatory repudiation theory (Br. at 15-16, MTD Reply at 3) misses the mark widely. As explained by the Court of Appeals in *Northville Industries*, the key to whether a plaintiff can sustain a claim for damages based on an anticipatory breach of an agreement is not simply the superficial question of whether it involves a landlord-tenant relationship – it is whether the agreement contains mutually interdependent contractual obligations. *Long Island R. Co. v. Northville Indus. Corp.,* 41 N.Y.2d 455, 465 (1977) *(*citing*, inter alia,* 11 Williston, Contracts, § 1327 at 157). Examining *Maflo*, on which Defendant chiefly relies, the Court of Appeals in *Northville Industries* explained in *dicta* that leases are examples of contracts "where obligations are ***sometimes*** treated as independent" (rather than interdependent), and it is "perhaps for this reason," courts in New York, including the court in *Maflo,* have required rent acceleration clauses for claims seeking future rent. *Id.* (discussing *Maflo Holding Corp. v S. J. Blume, Inc*., 308 NY 570, 575 (1977)). The Court of Appeals went on to explain how the agreement at issue there ***did*** contain mutual, interdependent obligations and, thus, permitted a claim for future moneys owed. *Id.* at 468.

The Third Department applied this very logic to a lease in *Pitcher.* There, the court reviewed the lease and concluded that it "imposed continuing obligations on [landlord] beyond simply making the premises available to [tenant] at the beginning of the lease term, including continuing obligations on [landlord's] part to repair the structural components of the building." *Pitcher v. Benderson-Wainberg Assocs. II, Ltd. P'ship*, 277 A.D.2d 586, 587 (App. Div. 3d Dep't 2000). Thus, "the lease did in fact contain the requisite mutually interdependent

contractual obligations such that the doctrine of anticipatory breach should not have been rejected as a matter of law." *Id*.[6]

The same is true here. As of the date of the anticipatory breach, the agreement remained *bilateral* with both sides having mutually interdependent obligations. For example, the Lease required Plaintiffs to, *inter alia*: (1) "warrant to Tenant for five (5) years . . . all repairs and replacements (including materials and labor) for all mechanical, electrical and plumbing systems … and for all interior build-out(s)," (Lease 3.9(c)); (2) ensure the land and building were in compliance with all laws (Lease 3.9(d), (f)); and (3) not apply for any tax abatements that would cause the Premises to be subject to rent regulation laws. (Lease 3.9(e)).

Defendant's suggestion that it needed to "take possession" of the Premises, or that the Rent Commencement Date under the Lease needed to occur, has no bearing on this analysis. Br. at 16; *see also* MTD Reply at 4. There can be no dispute that the obligations of both parties began as of the Effective Date. MTD Opp. at 15; MTD Reply at 4. (failing to rebut Plaintiffs' argument). And Defendant's Rule 11 Brief cites no authority to the contrary—let alone any authority to suggest Plaintiffs' position is objectively unreasonable. Defendant's citation to *dicta* in cases like *Tirse* and *ZCWK*, cited in its MTD Reply, likewise offers no support. MTD Reply at 4 (citing *Tirse v. Andrews*, 128 A.D.3d 1112, 1113 (App. Div. 3d Dep't 2015) and *ZCWK Assocs., L.P. v. Spadaro,* 233 A.D.2d 126, 127 (App. Div. 1st Dep't 1996)).

In fact, *Tirse* cited *Pitcher* with approval and remanded the case to determine whether an anticipatory breach of the relevant lease had occurred. *Tirse*, 128 A.D. 3d at 1113. Furthermore, both *Tirse* and *ZCWK* are irrelevant because they concerned situations where the *landlord* was

---

[6] The MTD Reply's suggestion that *Pitcher* "does not address rent acceleration" completely ignores that the landlord cross-claimed for ***future rent*** and that the Third Department remanded the case for a hearing on damages. 277 A.D.2d at 587.

the repudiating party and observed the tenant would not owe rent in a situation where the tenant is evicted from the premises.[7]  *Id.*; *ZCWK,* 233 A.D.2d at 127. Indeed, in *ZCWK*, the First Department's decision made clear that the fact that tenant had not yet taken possession or commenced paying rent was relevant simply because it meant the tenant could not yet have defaulted on the Lease. 233 A.D.2d at 127. Here, Tenant clearly could (and did) default on the Lease prior to taking possession.

*Second,* Defendant argues that the "Amended Complaint is barred by the Lease and the Guaranty." Br. at 16. How so? The only support Defendant identifies for this contention is the existence of a damages mitigation provision. That provision states only that "Landlord and Tenant shall each use commercially reasonable efforts to mitigate any damages resulting from a default of the other party under the Lease" and "if Landlord re-leases any portion of the Premises," Tenant should be entitled to a credit to its liability based on the fair market rent at the time. Lease ¶ 19.5. Defendant does not even attempt to explain how this provision could "bar" the Amended Complaint. In fact, Defendant's own brief suggests this provision would only bar Plaintiff's claim for Defendant's self-styled "future rent" claim. Br. at 16.

Instead, Defendant argues that Plaintiffs should be sanctioned for saying something they never said, *i.e.*, a "farcical contention that Landlord cannot mitigate its damages in the next 10 years" due to prevailing COVID-19 orders. *Id*. at 17. In accusing Plaintiffs of misleading, Defendant again does just that. The Amended Complaint makes no such contention. Rather, it states that Plaintiffs "***presently*** have no realistic way to mitigate damages" and that "[s]ince

---

[7] Indeed, the Defendant's quotations from these cases both relied on the Court of Appeals' rule in *Barash* (which Defendant tellingly does not cite), which stated that the obligation to pay rent is suspended where the tenant is actually evicted. *See Tirse,* 128 A.D.3d at 1113 (App. Div. 3d Dep't 2015) and  *ZCWK*, 233 A.D.2d at 127 (both quoting *Barash v. Pennsylvania Term. Real Estate Corp.*, 26 N.Y.2d 77, 82–84 (1970).  That proposition has no relevance here.

Quarters' breach . . . prevailing government orders and social distancing guidelines have restricted Cedar's ability to physically show the Premises to another Tenant." Am. Compl. ¶ 46 (emphasis added). Those allegations were completely true. Unlike Defendant—who confidently proclaims these restrictions will soon abate—Plaintiffs do not pretend to have a crystal ball and were not willing to boldly declare, in the Amended Complaint, the future timeline and trajectory of those orders. Plaintiffs' accurate allegations about government orders of public record do not warrant sanctions.

*Third,* Defendant attacks Plaintiffs' allegation that Section 21.1 of Lease unconditionally required Tenant to provide [an estoppel] certificate at Cedar's request"—noting that "there is nothing 'unconditional' about the obligations in Section 21.1." Br. at 17. Again, Defendant is wrong. Section 21.1, in its entirety states:

> Tenant shall, at any time within fifteen (15) Business Days after Landlord's request, execute and deliver an estoppel certificate certifying the following: (i) whether this Lease is unmodified (or, if there has been a modification, setting forth such modification); (ii) the Commencement Date, the Rent Commencement Date and the Expiration Date; (iii) the amounts of Base Rent and Additional Rent then currently payable by Tenant; (iv) the date through which Base Rent and Additional Rent have been paid; (v) that Tenant has no knowledge of any then uncured defaults by Landlord under this Lease (or, if Tenant has such knowledge, specifying them in detail); (vi) that there are no voluntary actions and, to Tenant's knowledge, involuntary actions, pending against Tenant under the bankruptcy laws of the United States or any State thereof; and (vii) any other information reasonably requested by Landlord. Any present or future Mortgagee and/or purchaser of the Project may rely upon any such estoppel certificate.

There is not a single "condition" to be found in this provision. Defendant suggests that subsection (v) above is a condition. But it clearly is not. It simply instructs the Tenant to note known, uncured defaults on the estoppel certificate. As described above, it is clear that Plaintiffs did not commit any default. *See* Counterstatement of Relevant Facts, Sec. I, *supra*. Nor did Defendant ever notice one. Indeed, Defendant never once even mentioned the notion of a

"default" until the time came to deliver the estoppel certificate.[8] Defendant is free to advance its counter-factual "default" argument on the merits, but there is nothing inaccurate about Plaintiffs' allegations, much less do they warrant sanctions.

### III.   The Allegations in the Complaint Are True and Supported by Evidence

Though Defendant argues incorrectly that the Amended Complaint is replete with false allegations, it only challenges one allegation as supposedly false: that, during a March 2020 telephone conversation, Defendant suggested to Mr. Tress that the parties could enter into a side letter acknowledging that Plaintiffs defaulted on the Lease but then provide an estoppel certificate to Plaintiffs' lender that stated there were no known uncured defaults. *See* Am. Compl. ¶ 40. Unrebutted evidence shows that allegation is true, not false.

Incredibly, though it seeks sanctions, Defendant ***does not even deny that it made just such a proposal.*** Ms. Albert's declaration goes as far as saying that the Amended Complaint "omits the details of the phone call" but does not deny that Quarters proposed entering into the side letter described in the Amended Complaint. Albert Decl. ¶ 4. Defendant's MTD Reply likewise states that only that "Landlord refused to execute" the "purported side letter." MTD Reply at 9 n.14. And that "there is nothing illegal about the alleged 'side letter,' as any modification of the Lease must be in writing.[9]" *Id.*  Defendant's tacit admission is deafening.

The only evidence that Defendant actually offers to support its contention of false allegations about statements in a phone call is email traffic that ***preceded*** the call. Defendant suggests that these communications definitively establish that the phone conversation was about

---

[8] Even the termination notice sent by Tenant a month later did not include a mention of a default. Rather, the notice merely states that the failure to deliver the Premises by the Outside Delivery Date gives Tenant "termination rights." *See* ECF No. 11-4 at 3.

[9] This dodge is, of course, beside the point. Plaintiffs allege that Defendant wanted to say one thing to a bank, while acknowledging that the very opposite was true in a side letter (which Defendant calls an "amendment"). *See* Am. Compl. ¶ 40. The Lease's requirements for amending the agreement are simply irrelevant to this issue.

an unrelated amendment to the agreement and not to elicit a side letter to the estoppel. That is incorrect. As Plaintiffs argued in their MTD Opposition, it is not at all surprising that Defendant would not want to put its fraudulent proposal in writing. Further, correspondence that actually purports to memorialize the call—which Defendant withheld from the Court on its Rule 11 motion and the produced only in redacted form following repeated requests—confirms that the Amended Complaint's allegations are accurate. *See* Counterstatement of Relevant Facts, Sec. II, *supra*.

In short, Defendant has not come close to establishing that this allegation is "utterly lacking in support." Fed. R. Civ. P. 11(b)(3); *Storey v. Cello Holdings, L.L.C.,* 347 F.3d 370, 388 (2d Cir. 2003) (internal quotations and citations omitted). Indeed, the only direct evidence on this point confirms Plaintiffs' allegations. Tress Decl. ¶ 4. At very most, Defendant has raised a disputed question of fact to be decided later in the proceedings, but certainly not a violation of Rule 11(b)(3). *See Safe-Strap Co. v. Koala Corp.,* 270 F. Supp. 2d 407, 418-19 (S.D.N.Y. 2003) (observing that Rule 11 motion was an inappropriate attempt at deciding disputed issues in the litigation and that a ruling on the motion prior to having a full record would be inappropriate).[10]

## IV.    Defendant's Allegations of an "Improper Purpose" are Wrong and Cannot Support a Motion for Sanctions

Defendant next argues that this case was brought with an improper purpose to "besmirch Quarters' reputation, and try to strong arm Tenant into withdrawing its Termination Notice." Br. at 20. This is nonsense. The purpose of Plaintiffs' complaint is clear on its face. Defendant

---

[10] Defendant does not cite any authority to the contrary. Defendant only cites three cases for the broad proposition that claims cannot be made in bad faith or with the intention of harassing one's adversary. Br. at 19. As set forth below, each of the cases only lends further support to Plaintiffs' arguments. *See infra* at 21-22.

16

encouraged Plaintiffs to invest over a million dollars into the property, asserted a bogus default, and then tried to leave Plaintiffs holding the bag.

Defendant's arguments also miss a fundamental point that they acknowledge earlier in their brief—the inquiry into whether conduct is sanctionable is an ***objective*** one. *See* Br. at 14. It is for this reason that the Second Circuit has made clear than a party's subjective intentions are irrelevant if it has brought a non-frivolous claim. *Sussman v. Bank of Israel,* 56 F.3d 450, 459 (2d Cir. 1995).[11]

Defendant's account of the statements made by Mr. Tress (and others) to them prior to the commencement of this lawsuit is, thus, simply irrelevant. As the Second Circuit explained in *Sussman,* it is not the role of Rule 11 to safeguard a defendant from public criticism that may result from the assertion of nonfrivolous claims. *Id.* The court went on to explain that "[m]ere warnings by a party of its intention to assert nonfrivolous claims, with predictions of those claims' likely public reception, are not improper." *Id.* The Second Circuit also concluded that certain prelitigation correspondence that threatened litigation did not change the analysis.[12] The court explained, "[i]t is hardly unusual for a would-be plaintiff to seek to resolve disputes without resorting to legal action; prelitigation letters airing grievances and threatening litigation if they are not resolved are commonplace, sometimes with salutary results, and do not suffice to

---

[11] Adopting the Ninth Circuit's reasoning, the Second Circuit explained that "the reason for this rule regarding complaints is that the complaint is, of course, the document which embodies the plaintiff's cause of action and it is the vehicle through which [he or she] enforces [his or her] substantive legal rights. Enforcement of those rights benefits not only individual plaintiffs but may benefit the public, since the bringing of meritorious lawsuits by private individuals is one way that public policies are advanced . . . . [I]t would be counterproductive to use Rule 11 to penalize the assertion of non-frivolous substantive claims, even when the motives for asserting those claims are not entirely pure. . . .[A] determination of improper purpose must be supported by a determination of frivolousness when a complaint is at issue." *Sussman*, 56. F3d at 459 (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir.1990) (alterations original).

[12] The alleged purpose there was to designed to force withdrawal of another action by threatening the Israeli government with bad publicity. *Sussman*, 56 F.3d at 459.

17

show an improper purpose if nonfrivolous litigation is eventually commenced." *Id. See also Revson v. Cinque & Cinque, P.C.,* 221 F.3d 71, 80-81 (2d Cir. 2000) (citing *Sussman* with approval and finding that plaintiff could not be sanctioned for public accusations of fraud where he reasonably believed he could prove it). [13]

The cases Defendant cites in support of this argument, and throughout its brief, underscore that this is not the "extreme case" where sanctions are warranted. *Bobcar Media,* 2019 WL 422613 at *5 (internal quotations and citations omitted). Notably, in a number of these cases, the parties did not just dispute a particular factual or legal proposition (as is the case here). Rather, the trial court had expressly found a particular proposition to be incorrect and the sanctioned party pursued the claim anyway.

For example, in *Morley* (Br. at 19), the court imposed sanctions because a plaintiff "willful[ly]" filed an amended pleading that directly "contravene[ed]" two orders from the court about the permissible scope of the pleading—including an express determination that plaintiff was not entitled to compensatory or punitive damages under the ADEA and an express instruction plaintiff should not seek them in the amended pleading. *Morley v. Ciba-Geigy Corp.,* 66 F.3d 21, 25 (2d Cir. 1995). Because the amended pleading included a request for those damages anyway, the Second Circuit agreed the pleading could only be viewed as a means of threatening the defendant into a larger settlement. *Id.*[14]

---

[13] Defendant's criticism of the inclusion of **already public** Internet reviews of its service are similarly unavailing. As the Amended Complaint makes clear, these reviews demonstrate that Quarters was not having operational success in the United States during the relevant time period. As with the economic downturn caused by COVID-19, these reviews and media accounts provide important context as to why Quarters suddenly wanted to find a reason to abandon a project that it had, for months, told Plaintiffs it was committed to. Plaintiffs expect that discovery will further confirm these accounts.

[14] *Morley* is also notable because it expressly contrasted its facts to those of *Sussman*—noting that while both parties threatened claims, Morley's claims were ***unambiguously barred by the law of the case*** while Sussman's claims were "not . . . meritless." *Id*. at 25 (citing *Sussman*, 56 F.3d at 459).

Likewise, in *Baasch* (Br. at 19), the court sanctioned a party where the court "previously warned Baasch in clear and unmistakable terms that his underlying action was frivolous" and the Baasch filed the motion at issue anyway. *Baasch v. Reyer*, 827 F. Supp. 940, 944 (E.D.N.Y. 1993). *Accord United States v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) (sanctioning defendant for, among other reasons, pursuing arguments previously rejected by courts hearing the dispute).[15]

In *Bello* (Br. at 21), the court relied on its inherent power to sanction a plaintiff after identifying more than ***seven different types*** of harassing behavior. *Bello v. Barden Corp.*, No. 3:01CV01531(AWT), 2006 WL 2827091, at *11-14 (D. Conn. Sept. 29, 2006). This conduct including filing numerous nuisance value lawsuits (rather than one consolidated lawsuit) for no objectively reasonable reason and continuing to press causes of action that the court and the sanctioned party's adversaries consistently demonstrated were without merit. *Id.*

Finally, in *Colliton* (Br. 21-22), the court sanctioned a plaintiff for an amended complaint that was a "transparent attempt to plead around the legal defenses presented by [the defendant]." *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 CIV 0400 (NRB), 2008 WL 4386764, at *13 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009). The court noted, for example, that the plaintiff alleged the infliction of emotional distress up to the end of his employment. But when the defendant asserted that this date fell outside the statute of limitations, the plaintiff amended his pleading to allege the intentional infliction continued after he left his job. *Id.* at *10-11. On top of this pleading, the plaintiff threatened to (and, in fact, did) sue a number of

---

[15] While Defendant relies on *Teamsters* to purportedly seek sanctions based on the Court's "inherent power," the Second Circuit did not even reach the issue of whether sanctions based on the trial court's inherent power were appropriate there. *Id.* Indeed, the court echoed the Supreme Court's warning that this power should be exercised with "restraint and discretion." *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). And sanctions will only be upheld when there is "clear evidence that the actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts." *Id.* (internal quotations omitted).

Cravath's large corporate clients for "tortious interference with his employment contract" if Cravath refused to settle. *Id.* at 14.

Each of these cases illustrates precisely what an "extreme case" and a true "improper purpose" looks like. Defendant's baseless challenges are light years away from the authorities on which it relies.

## V.    Defendant's Refusal to Provide Full Discovery Precludes Its Motion for Sanctions

Defendant has outright refused to provide full discovery into the facts underlying its own Rule 11 motion. This alone warrants denial of the motion, independent of all the foregoing bases for denial.

After Defendant filed its baseless Rule 11 motion, Plaintiffs sent a request for all correspondence relating to the assertions made and conversations referenced in Ms. Albert's declaration. *See* Kritzer Decl. Ex B at 13-14. Defendant initially deflected that request with a number of reciprocal demands, stating it would produce these obviously discoverable documents only if Defendant made a number of unrelated discovery concessions. *Id.* at 12. Plaintiffs welcomed the prospect of a more fulsome discussion of how to move discovery forward but made clear they would not allow that to delay production of correspondence relating to Plaintiffs' motion, which Defendant ***should have collected and reviewed before filing their motion.*** *Id.* at 11. Recognizing the absurdity of its position that it could withhold documents relevant to its own sanctions motion, Defendant made a limited and incomplete production of ***some***, but not all, of the relevant documents. *Id.* at 6-8.

Even Defendant's limited production is devastating to its position. *See* Counterstatement of Relevant Facts, Sec. II, *supra*. So much so, that Defendant has refused to provide further discovery relevant to this motion based on an absurd position that Plaintiffs' discovery into

Defendant's assertions in its ***own Rule 11 motion*** should be "stayed" because it filed a separate motion under Rule 12(b)(6). *See* Kritzer Decl. Ex. B at 1.

Discovery produced to date shows that Plaintiffs have completely refused to collect documents from the custodial files of at least three highly relevant individuals—Bobby Condon, Philip Grace, and Rui Barros—each of whom was an addressee of the Lindheim Email disclosing the substance of Quarters' fraudulent proposal. Plaintiffs are withholding these documents based on their assertion that an as-yet nonexistent "stay" should apply to discovery "until the resolution of the motion to dismiss." Kritzer Decl. Ex. B at 1.

Defendant's position is utterly indefensible. ***No*** stay of discovery is warranted here, none is automatically imposed or otherwise in place, and Plaintiffs will respond to any motion to stay in full should Defendant file one. But at minimum, Defendant, who seeks to have Plaintiffs sanctioned based on true statements about which Defendant is intentionally withholding relevant evidence, must provide discovery relating to assertions in its own Rule 11 motion.

## VI.    Defendant is Not Entitled to Any of the Sanctions It Seeks

As described above, Defendant's request for sanctions is entirely baseless and should be rejected in its entirety because there has been no Rule 11 violation. *See W.K. Webster & Co. v. Am. President Lines, Ltd.*, 32 F.3d 665, 670 (2d Cir. 1994) (finding certain arguments were not "so patently void of any legal or factual basis that an award of attorneys' fees was required"). But separate and apart from these flaws, the remedies that Defendant purports to seek under Rule 11 are completely unsupported.

Most glaringly, Defendant has not pointed to a single authority for the proposition that it would be entitled to dismissal of the claims with prejudice or an order directing the return of

Tenant's security deposit with interest.[16] The Second Circuit has been clear that a dismissal sanction should be used in the rarest of circumstances. *See Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 417–18 (S.D.N.Y. 2003) (collecting cases). And Plaintiffs are aware of no authority supporting Defendant's request that Plaintiffs be directed to return the security deposit with interest as a sanction. This unfounded request essentially asks the Court to decide the merits of a claim that has not been brought. *See id.* at 416. (denying Rule 11 motion where a party was simply using the motion to bypass resolution of a particular issue on the merits). *Cf. Bobcar Media,* 2019 WL 422613, at *3 ("[C]ourts must remain mindful that the point of Rule 11 sanctions is not to compensate or reimburse the defendants for the totality of their losses, but rather to punish and to deter future similar conduct.") (internal citations and quotations omitted).

## VII.    Plaintiffs Are Entitled to Costs for Defendant's Frivolous Motion

The purpose of Defendant's Rule 11 motion is clear. Defendant has faced public scrutiny after its wrongful conduct has come to light and seeks deflect Plaintiffs' straightforward, well-supported allegations by filing a motion calling them "frivolous." The motion lacks even a grain of merit and is a waste of the Court's and Plaintiffs' time.

Rule 11(c)(2) permits the court to award, "if warranted, . . . the prevailing party reasonable expenses, including attorney's fees." *See* Argument, Sec. I, *supra*. Such costs are warranted here. As set forth above, Defendant's brief strings together a series of accusations (and inapposite case law) against Plaintiffs but then completely fails to back them up. For example:

- Defendant incorrectly states that Plaintiffs' allegations that a default occurred were "false," and then completely misstates the relevant provisions of the Lease;

---

[16] The only authority Defendant cites to for this proposition is *In re September 11th Liability Insurance Coverage Cases*. There, Judge Hellerstein imposed a considerable monetary sanction where a defendant repeatedly took a legal position unsupported by the evidence—which "multiplied proceedings"—and engaged in a pattern of discovery violations. 243 F.R.D. 114, 131 (S.D.N.Y. 2007). Putting aside the mile-wide difference in facts, that case said nothing about dismissal with prejudice or the court's power to require a party to return property without a decision on the merits.

- Defendant incorrectly calls all of Plaintiffs' legal theories "impossible," and the only legal theory its brief challenges is Plaintiffs' well-supported claim that it is entitled to damages for a total breach;

- Defendant incorrectly declares that the "Amended Complaint is barred by the Lease and the Guaranty" and does not point to a single provision that says so; and

- Defendant accuses Plaintiffs of making false allegations about Quarters' side letter proposal, but never once denies that such an offer was made.

Defendant has not raised a single, colorable reason why Plaintiffs should be sanctioned. And Plaintiffs should not be required to bear costs of Defendant's frivolous and needless motion practice. Defendant should be ordered to pay Plaintiffs' costs and attorneys' fees in opposing this motion.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for sanctions should be denied in its entirety and attorney's fees should be awarded to Plaintiffs.

Dated: August 10, 2020

Respectfully submitted,

STEPTOE & JOHNSON LLP

By:  */s/ Nathaniel J. Kritzer*

Nathaniel J. Kritzer
Michael G. Scavelli
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
nkritzer@steptoe.com

*Counsel for Plaintiffs*